James H. LESAR, Appellant,

v.

UNITED STATES DEPARTMENT OF JUSTICE.

No. 78–2305.

United States Court of Appeals, District of Columbia Circuit.

Argued 24 April 1980.

Decided 15 July 1980.

James H. Lesar, pro se.

Linda Jan S. Pack, Atty., Dept. of Justice, Washington, D. C., with whom Alice Daniel, Asst. Atty. Gen., Charles F. C. Ruff, U. S. Atty., Leonard Schaitman, Atty., Dept. of Justice, Washington, D. C., were on the brief for appellee. Barbara L. Herwig, Atty., Dept. of Justice, Washington, D. C., entered an appearance for appellee.

Before BAZELON, Senior Circuit Judge, and WILKEY and EDWARDS, Circuit Judges.

Opinion for the Court filed by Circuit Judge WILKEY.

Concurring opinion filed by Senior Circuit Judge BAZELON.

WILKEY, Circuit Judge:

This case arises under the Freedom of Information Act (FOIA).[1] Appellant requested certain reports and documents from the United States Department of Justice (Department) pertaining to the FBI's investigation of Dr. Martin Luther King, Jr. and its investigation of the assassination of Dr. King. The United States District Court granted summary judgment to the Department on grounds that the documents at issue were exempt from disclosure under Exemptions 1, 2, 7(C) and 7(D) of the FOIA,[2] and appellant seeks to challenge that order here. For reasons elaborated below, we affirm in all respects.

## I. FACTS AND PROCEDURAL BACKGROUND

### A. Historical Background

The chronology of events must be elaborated in some detail. On 24 November 1975 Attorney General Edward H. Levi directed the Civil Rights Division of the Department of Justice to review all Department and FBI files pertaining to Dr. King. The overall purpose of this inquiry was to determine whether the investigation of Dr. King's assassination should be reopened. Specifically, the Civil Rights Division was instructed to ascertain whether the FBI was involved directly or indirectly in the assassination of Dr. King and to assess the substance of the claim that the FBI had conducted an extensive operation to harass Dr. King.[3]

Several months later on 31 March 1976, Robert A. Murphy, the head of the Criminal Section of the Civil Rights Division, completed a fifty-one page report (Murphy Report) detailing the results of the inquiry. The Murphy Report and accompanying memorandum stated that no evidence existed that the FBI was involved in any way in the assassination of Dr. King or that the FBI's investigation of the King assassination was anything less than thorough.[4] The Report further stated that the FBI had placed Dr. King under constant electronic surveillance from late 1963 until Dr. King's death in April 1968. The Report concluded that, although the surveillance initially was

1. 5 U.S.C. § 552 (1976).

2. *Id.* § (b)(1), (2), (7)(C), (7)(D).

3. *See* Memorandum from Robert A. Murphy, Chief of the Criminal Section of the Civil Rights Division, to J. Stanley Pottinger, Assistant Attorney General, Civil Rights Division of the Department of Justice (31 Mar. 1976) (Murphy Report), *reprinted in* Joint Appendix (J.A.) at

138. The Murphy Report is one of the documents at issue in this case. Those portions of the Report that were not withheld pursuant to the FOIA are reprinted in the Joint Appendix, and the relevant exemptions for the excised portions are also indicated. *See* J.A. at 138–88.

4. *See id.* at 143–44.

undertaken as part of a legitimate security investigation to determine whether Dr. King or some of his affiliates were under Communist influence,[5] it soon after degenerated into a campaign "to discredit and to neutralize Dr. King and to remove him from a leadership role in the civil rights movement."[6] The Murphy Report and accompanying memorandum, together with a cover memorandum (Pottinger Memorandum), dated 9 April 1976, from J. Stanley Pottinger, the Assistant Attorney General for the Civil Rights Division, were transmitted to the Attorney General.

Soon after receiving these reports, Attorney General Levi directed Michael E. Shaheen, head of the Department's Office of Professional Responsibility, to complete the review undertaken by the Civil Rights Division. A special Task Force was created for this purpose, and on 11 January 1977 the Task Force submitted to the Attorney General its final report entitled "Report of the Justice Department Task Force to Review the FBI Martin Luther King, Jr. Security and Assassination Investigations" (Task Force Report).[7] The Task Force Report, consisting of 149 pages and 3 voluminous appendices, reached the same conclusions as those drawn in the Murphy Report. This Report was released to the public on 18 February 1977 with the exception of the three appendices to the Report.

The two Civil Rights Division memoranda, i. e., the Murphy Report and the Pottinger Memorandum, as well as the three appendices to the Task Force Report are the subject of dispute in this case.

### B. *Administrative Proceedings*

In his FOIA request dated 7 February 1977 appellant sought the following: (1) any directive instructing the Civil Rights Division to review the investigation of the King assassination, (2) the Murphy Report and accompanying Pottinger Memorandum detailing the results of the inquiry conducted by the Civil Rights Division, (3) any press release from the Civil Rights Division on the review of the King assassination, (4) any directive instructing the Office of Professional Responsibility of the Department to complete the review of the investigation of Dr. King's assassination, (5) any directive to the Task Force setting forth its purpose, and (6) the Task Force Report detailing the results of the Task Force study of the King assassination.[8] Appellant was provided with complete copies of the documents identified in items 1, 3, and 4 of his request and was advised that no documents existed responsive to item 5 of his request.[9] Items 2 and 6 thus remain subject to demand.

In response to item 2, appellant initially was denied access to the Murphy Report and Pottinger Memorandum on the ground that these documents had been classified in their entirety on 9 April 1976 and thus were exempt from disclosure under Exemption 1 of the FOIA.[10] Subsequently, on administrative appeal, certain portions of the documents, including the whole of the memorandum accompanying the Murphy Report, were declassified and released to appel-

---

5. *See, e. g., id.* at 145.

6. *Id.* at 138.

7. *See, e. g.*, Brief for Appellee at 4.

8. *See* Plaintiff's Freedom of Information Request (7 Feb. 1977), *reprinted in* J.A. at 10.

9. *See* Letter from James P. Turner, Deputy Assistant Attorney General, Civil Rights Division, to James H. Lesar (9 Mar. 1977) (item 1), *reprinted in* J.A. at 16; Letter from Marvin Wall, Director of Public Information, Department of Justice to James H. Lesar (3 Mar. 1977) (item 3); Letter from Michael E. Shaheen, Counsel for the Office of Professional Responsibility, Department of Justice, to James

H. Lesar (23 Feb. 1977) (item 4), *reprinted in* J.A. at 11; *id.* (item 5).

10. *See* Letter from James P. Turner, Deputy Assistant Attorney General, Civil Rights Division, to James H. Lesar (9 Mar. 1977), *reprinted in* J.A. at 16, 17. Mr. Turner also asserted that the documents were exempt under Exemption 5 of the FOIA as intra-agency memoranda, *see* 5 U.S.C. § 552(b)(5) (1976), and that certain portions were exempt under subsections 7(C) and 7(E) of the FOIA, *id.* § 552(b)(7)(C), (7)(E). The Department continues to rely on Exemption 7(C) on this appeal. *See, e. g.*, note 31 *infra* and accompanying text.

lant.[11] Other segments of the Murphy Report and Pottinger Memorandum still were withheld under Exemption 1, and also under Exemption 7(C) of the FOIA on the grounds that disclosure of these documents would constitute an unwarranted intrusion into the privacy of third parties.[12]

In response to item 6 of appellant's request, appellant was provided with a copy of the Task Force Report by letter dated 23 February 1977.[13] By letter dated 10 March 1977 Lesar amended his request to include the three appendices to the Task Force Report.[14] Appendix A consists of eighteen exhibits and documents referred to in the body of the Report, and Appendix B contains the Task Force's typewritten notes on interviews of witnesses. Appendix C consists of twenty volumes: twelve of which are summaries of all FBI documents reviewed by the Task Force; and eight of which are non-Departmental records including, *inter alia*, Memphis and Atlanta police department records furnished to the Task Force for its review of the King assassination. In response to appellant's letter, the Office of Professional Responsibility initially withheld the materials in Appendix A and Appendix C and released every page of Appendix B, with minor deletions.[15]

On administrative appeal the Department released certain additional materials from the appendices, and continued to withhold the remaining documents pursuant to various exemptions to the FOIA [16] and pursuant to the order of the United States District Court in *Lee v. Kelley*.[17] In *Lee v. Kelley* the district court had ordered the FBI's actual surveillance records and tapes on Dr. King and his associates placed under seal for fifty years. On the basis of this order, the Department concluded that it was not permitted to disclose those volumes of Appendix C to the Task Force Report that summarize the sealed surveillance materials.[18]

### C. District Court Proceedings

On 21 April 1977 appellant brought suit in the United States District Court for the District of Columbia seeking disclosure of those documents still withheld.[19] In response to appellant's *Vaughn v. Rosen* motion [20] the Department on 1 February 1978 filed affidavits describing in detail the documents at issue and explaining the treat-

11. Certain portions of the Murphy Report and the Pottinger Memorandum were also reclassified at a higher level. *See, e. g.,* Supplemental Affidavit of James P. Turner ¶ 3 (11 May 1978), *reprinted in* J.A. at 131, 133–34.

12. *See, e. g.,* Affidavit of James P. Turner ¶¶ 2–5 (1 Feb. 1978), *reprinted in* J.A. at 45, 46–47; Affidavit of Salliann M. Dougherty ¶¶ 6–14 (1 Feb. 1978), *reprinted in* J.A. at 48, 51–55; Affidavit of Lewis L. Small ¶¶ 13–17 (11 May 1978) (Exemption 1), *reprinted in* J.A. at 84, 116–21.

13. *See* Letter from Michael E. Shaheen, Counsel for the Office of Professional Responsibility, Department of Justice, to James H. Lesar (23 Feb. 1977), *reprinted in* J.A. at 11. Appellant was also provided with certain materials from Appendix A to the Task Force Report.

14. *See* Letter from James H. Lesar to Griffin Bell, Attorney General (10 Mar. 1977), *reprinted in* J.A. at 19.

15. *See, e. g.,* Affidavit of Michael E. Shaheen ¶ 13 (1 Feb. 1978), *reprinted in* J.A. at 72, 75.

16. The materials were withheld under Exemptions 1, 2, 6, 7(C), 7(D), and 7(E) of the FOIA, 5 U.S.C. § 552(b)(1), (2), (6), (7)(C), (7)(D), (7)(E) (1976). *See* Affidavit of Michael E. Shaheen (1 Feb. 1978), *reprinted in* J.A. at 72, 77–79.

17. Nos. 76–1185, 76–1186 (D.D.C. 31 Jan. 1977).

18. *See, e. g.,* Affidavit of Michael E. Shaheen at 3, 9 (1 Feb. 1978), *reprinted in* J.A. at 72, 74, 80.

19. Appellant brought suit while his administrative appeal was still pending because the Department was unable to complete the processing of appellant's request within the applicable time limit. Judge Gesell granted a stay pending completion of administrative review, and the administrative proceeding was concluded on 31 October 1977. As a result of the administrative review, appellant was provided with additional materials from the three appendices to the Task Force Report.

20. 484 F.2d 820 (D.C. Cir. 1973), *cert. denied*, 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974). Appellant's motion was filed on 13 July 1977.

ment of appellant's FOIA request.[21] The Department filed additional affidavits in support of its motion for summary judgment on 11 May 1978;[22] appellant filed a cross-motion for summary judgment on 12 May 1978 with supporting affidavits.[23] On the basis of the affidavits submitted and an *in camera* inspection of certain of the documents, the district court entered summary judgment for the Department on 31 July 1978.[24]

The district court resolved the various issues before it according to the categories of materials in dispute: (1) the Task Force summaries of the FBI's electronic surveillance records and tapes of Dr. King; (2) classified information; (3) code symbols that refer to FBI informants; (4) privacy materials; and (5) Memphis and Atlanta police records, which were furnished to the Task Force in aid of its investigation of the assassination.

First, regarding the summaries of the sealed surveillance materials, Judge Gesell had informed the Department in a hearing held on the cross-motions for summary judgment that these documents might be subject to the FOIA even though the underlying surveillance records had been placed under seal.[25] Accordingly, the Department released certain portions to appellant, with-

held other excerpts under various exemptions to the FOIA, and continued to withhold fifteen pages in their entirety solely in reliance on the district court order in *Lee v. Kelley*. After examining the affidavits submitted for these materials, Judge Gesell sustained the claimed exemptions under the FOIA,[26] but ruled that the pages withheld pursuant to the order in *Lee v. Kelley* must be released.[27] The latter ruling is not at issue here.

Second, the Department withheld certain portions of the Murphy Report, the Pottinger Memorandum, and Appendices A and C to the Task Force Report pursuant to Exemption 1 of the FOIA. On the basis of the affidavits submitted, the court sustained the claimed exemption, finding that the documents were classified in accord with the relevant criteria.[28]

Third, relying on Exemptions 2 and 7(D) of the FOIA, the Department deleted certain markings used to identify FBI informants from some of the documents released to appellant. The district court determined that these symbols "related solely to the agency's internal personnel rules and practices"[29] within the meaning of Exemption 2 of the FOIA.[30]

---

**21.** *See* Affidavit of Michael E. Shaheen (1 Feb. 1978), *reprinted in* J.A. at 72; Affidavit of William N. Preusse (1 Feb. 1978), *reprinted in* J.A. at 56; Affidavit of James P. Turner (1 Feb. 1978), *reprinted in* J.A. at 45; Affidavit of Salliann M. Dougherty (1 Feb. 1978), *reprinted in* J.A. at 48.

**22.** *See* Affidavit of Lewis L. Small (11 May 1978), *reprinted in* J.A. at 84; Affidavit of James F. Walker (10 May 1978), *reprinted in* J.A. at 125; Supplemental Affidavit of James P. Turner (11 May 1978), *reprinted in* J.A. at 131. *See also* Affidavit of Horace P. Beckwith (22 May 1978), *reprinted in* J.A. at 189; Affidavit of Hugh W. Stanton (22 May 1978), *reprinted in* J.A. at 194. The Beckwith and Stanton affidavits accompanied the Department's Reply Memorandum to its motion for summary judgment.

**23.** *See* Affidavit of James H. Lesar (23 May 1978), *reprinted in* J.A. at 228; Affidavit of Harold Weisberg (23 May 1978), *reprinted in* J.A. at 232; Supplemental Affidavit of James

H. Lesar (2 June 1978), *reprinted in* J.A. at 279; Affidavit of Harold Weisberg (4 June 1978), *reprinted in* J.A. at 291.

**24.** *See Lesar v. United States Dep't of Justice,* 455 F.Supp. 921 (D.D.C.1978).

**25.** Eleven of the twenty volumes in Appendix C to the Task Force Report contain summaries of FBI documents that were placed under seal pursuant to the court's order in *Lee v. Kelley,* Nos. 76–1185, 76–1186 (D.D.C. 31 Jan. 1977).

**26.** Fifty-two pages were released to appellant with deletions. The expurgated pages were withheld under Exemptions 1, 2, 7(C), 7(D), and 7(E) of the FOIA. *See Lesar v. United States Dep't of Justice,* 455 F.Supp. 921, 923–24 (D.D.C.1978).

**27.** *See id.*

**28.** *See id.* at 924–25.

**29.** *See* 5 U.S.C. § 552(b)(2) (1976).

**30.** *See Lesar v. United States Dep't of Justice,* 455 F.Supp. 921, 925 (D.D.C.1978).

Fourth, the Department invoked Exemption 7(C) of the FOIA for certain segments of the Civil Rights Division Memoranda and the appendices to the Task Force Report, alleging that the release of this information would constitute an unwarranted invasion of the privacy of third parties. The district court agreed that the privacy interests of the individuals involved outweighed the public interest in disclosure and sustained the claimed exemption.[31]

Finally, pursuant to Exemption 7(D) of the FOIA, the Department withheld the Atlanta and Memphis police records of the King assassination, which were collected in Appendix C to the Task Force Report. After examining these records *in camera*, the district court upheld the deletion, ruling that the records at issue consisted of confidential information furnished during the course of a law enforcement investigation within the meaning of Exemption 7(D).[32]

This appeal followed. We shall consider in turn each of the claimed exemptions at issue.

## II. ANALYSIS

### A. *Exemption 1*

#### 1. *The Relevant Executive Order*

Exemption 1 protects against disclosure matters that are "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such an Executive order."[33] At issue under this exemption are excerpts from the Civil Rights Division memoranda, *i. e.*, the Murphy Report[34] and the Pottinger Memorandum,[35] and excerpts from the materials in Appendix A[36] and Appendix C[37] to the Task Force Report. The district court determined that the documents were classified in strict compliance with the relevant Executive Order and thus sustained the exemption for these materials under subsection 1.

■ At the outset, we are faced with the issue of which Executive Order should apply. In this case the documents were classified pursuant to Executive Order No. 11,652,[38] and the district court followed the criteria established in that Order in its determination of the Exemption 1 issue. After the issuance of the district court's opinion, however, Executive Order No. 11,652 was supplanted by Executive Order No. 12,065.[39] Appellant contends that the current Executive Order should govern, and thus urges this court to remand to the district

---

31. *See id.* at 925–26.

32. *See id.* at 924.

33. 5 U.S.C. § 552(b)(1) (1976).

34. Selected excerpts from 24 of the 51 pages of the Murphy Report were classified as "Top Secret," "Secret," or "Confidential" and withheld pursuant to Exemption 1. *See, e. g.*, Affidavit of Lewis L. Small at 35–37 (11 May 1978), *reprinted in* J.A. at 84, 118–20.

35. Two paragraphs from the ten-page Pottinger Memorandum were classified as "Top Secret" and "Secret," respectively, and withheld pursuant to Exemption 1. *See id.* at 35, J.A. at 84, 118.

36. Appendix A to the Task Force Report, it will be recalled, consists of 18 exhibits and documents referred to in the body of the Report. Selected portions from Exhibits Nos. 8, 11, and 12 were withheld pursuant to Exemption 1, and Exhibits Nos. 17 and 18 were withheld in their entirety under this exemption. *See id.* at 5–9, J.A. at 84, 88–92.

37. To recall briefly, Appendix C to the Task Force Report consists of twenty volumes. Eight of the volumes are non-Departmental records including, *inter alia*, the Memphis and Atlanta police records of the King assassination. Twelve of the volumes are brief summaries of all FBI and Department documents reviewed by the Task Force, eleven of which pertain to the FBI's so-called national security investigation of Dr. King and the remaining volume to the FBI's investigation of the assassination of Dr. King. Portions of the latter eleven volumes were withheld pursuant to Exemption 1. *See id.* at 9–33, J.A. at 84, 92–116.

38. Exec. Order No. 11,652, 3 C.F.R. 375 (1973) (superseded).

39. Exec. Order No. 12,065, 3 C.F.R. 190 (1979). Executive Order No. 12,065 went into effect on 1 December 1978.

court for a determination of whether the documents fall within the criteria set forth in Executive Order No. 12,065. We reject this argument and hold that the Executive Order in effect at the time the classifying official acted states the relevant criteria for purposes of determining whether Exemption 1 properly was invoked.

Looking to the terms of the Executive Order currently in force, "classified information" is defined in section 6–102 as "information or material . . . that has been determined pursuant to this [Executive] Order *or prior [Executive] Orders* to require protection against unauthorized disclosure, and that is so designated." [40] Thus, information once properly classified under a prior Executive Order will retain the protection afforded it under the former Order. The obvious implication of this provision is that a reviewing court should assess the agency's classification decision according to the guidelines established in the Executive Order in effect at the time classification took place. [41] We are persuaded that this rule makes sense. [42] To hold otherwise and require a remand whenever a new Executive Order issued during the pendency of an appeal would not only place a heavy administrative burden on the agencies but would also cause additional delays in the ultimate processing of these types of FOIA requests.

Of course, when an agency first receives a FOIA request, it may wish to reevaluate its initial classification decision to determine whether the materials requested require declassification or reclassification at a higher level, if circumstances so dictate. The agency looks to the procedures and substantive criteria contained in the Executive Order then in force rather than those found in the Executive Order under which the initial classification decision was made. [43] On review, the court should also assess the documents according to the terms of the Executive Order under which the agency made its ultimate classification determination. *The general principle espoused here, then, is that a reviewing court should assess classification under the Executive Order in force at the time the responsible official finally acts.*

Having concluded that Executive Order No. 11,652 states the relevant criteria with respect to the classification of the documents at issue, we turn to the question of whether the district court correctly ruled that the materials were classified in accordance with the requirements of Executive

---

40. Exec. Order No. 12,065, § 6–102, 3 C.F.R. 190, 204 (1979) (emphasis added).

41. The Supreme Court's decision in *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975), in no way undermines our interpretation that the Executive Order in force at the time the agency acted should guide a court's determination of the Exemption 1 issue. In *Sears*, the Court held that the version of the FOIA in force at the time of judicial review must govern rather than the version of the FOIA in force at the time the agency acted. *See id.* at 164–65, 95 S.Ct. at 1523. In this case, however, it is not the FOIA itself that has been amended, but rather the Executive Order interpreting Exemption 1 of the statute. The clear implication of the current Executive Order is that the determination of whether the agency's initial classification was proper should be made according to the Executive Order in effect at the time the agency acted. Of course the new version of the statute involved in *Sears* carried no such implication.

42. Our conclusion draws some support from the Supreme Court's decision in *EPA v. Mink*, 410 U.S. 73, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973). In that case, as in the case before us, documents were classified under an Executive Order that was supplanted by another Executive Order while the case was on appeal. The Supreme Court applied the criteria set forth in the prior Executive Order to ascertain whether classification was proper. *See id.* at 84, 93 S.Ct. at 834. The Court left some confusion, however, regarding which Executive Order was controlling because it implied that the documents properly were classified under the criteria contained in the current Executive Order as well. *See id.* at nn. 9 & 10.

43. Executive Order No. 12,065 expressly provides that information classified under prior orders will be considered for declassification under the schedules and procedures in effect under the current Order. *See, e. g.,* Exec. Order No. 12,065, §§ 2–302, 3–101, 3–301, 3 C.F.R. 190, 195, 196, 197 (1979).

Order No. 11,652 and exempt from disclosure under Exemption 1. The trial court must conduct a *de novo* review of the agency's classification decision, with the burden on the agency of demonstrating proper classification under both the procedural and substantive criteria contained in the governing Executive Order.[44] We review first the district court's consideration in this instance of the substantive requirements of Executive Order No. 11,652.

## 2. Substantive Criteria Established By Executive Order No. 11,652

■ Executive Order No. 11,652 states that documents are to be classified as "Top Secret" if disclosure of the information "reasonably could be expected to cause exceptionally grave damage to the national security," as "Secret" if release of the information "reasonably could be expected to cause serious damage to the national security," and as "Confidential" if release of the material "reasonably could be expected to cause damage to the national security."[45] The standard that the district court must apply in making its *de novo* review of the

agency's classification decision, then, is whether unauthorized disclosure of the materials reasonably could be expected to cause the requisite harm.[46] The agency may satisfy this standard by submitting affidavits to the court that describe with reasonable specificity the nature of the documents at issue and the justification for nondisclosure; the description provided in the affidavits must show that the information logically falls within the claimed exemption.[47]

■ In making its assessment, the district court is to afford "substantial weight" to the agency's affidavits.[48] We have interpreted this requirement to mean that if the affidavits contain information of reasonable detail, sufficient to place the documents within the exemption category, and if the information is not challenged by contrary evidence in the record or evidence of agency bad faith, then summary judgment for the Government is appropriate without an *in camera* review of the documents.[49] *In camera* inspection need only be used if the affidavits are insufficient for a responsible *de novo* determination.[50]

**44.** This is a clear statutory requirement. *See* 5 U.S.C. § 552(a)(4)(B) (1976); S.Rep.No. 1200, 93d Cong., 2d Sess. 11–12 (1974), U.S.Code Cong. & Admin.News 1974, p. 6267.

**45.** Exec. Order No. 11,652, § 1(A), (B), (C), 3 C.F.R. 375, 376 (1973).

**46.** *See, e. g, Hayden v. National Security Agency/Central Security Serv.*, 608 F.2d 1381, 1387 (D.C. Cir. 1979), *cert. denied*, 446 U.S. 937, 100 S.Ct. 2156, 65 L.Ed.2d 790 (1980).

**47.** *See id.* at 1386–87; *Ray v. Turner*, 587 F.2d 1187, 1194–95 (D.C. Cir. 1978); *Weissman v. CIA*, 565 F.2d 692, 697 (D.C. Cir. 1977).

**48.** *See Hayden v. National Security Agency/Central Security Serv.*, 608 F.2d 1381, 1384 (D.C. Cir. 1979), *cert. denied*, 446 U.S. 937, 100 S.Ct. 2156, 65 L.Ed.2d 790 (1980); *Ray v. Turner*, 587 F.2d 1187, 1194 (D.C. Cir. 1978); *Weissman v. CIA*, 565 F.2d 692, 697 n. 10 (D.C. Cir. 1977); S.Rep.No. 1200, 93d Cong., 2d Sess. 12 (1974).

**49.** *See Hayden v. National Security Agency/Central Security Serv.*, 608 F.2d 1381, 1386–87 (D.C. Cir. 1979), *cert. denied*, 446 U.S. 937,

100 S.Ct. 2156, 65 L.Ed.2d 790 (1980); *Ray v. Turner*, 587 F.2d 1187, 1194–95 (D.C. Cir. 1978); *Weissman v. CIA*, 565 F.2d 692, 696–98 (D.C. Cir. 1977).

**50.** *Hayden v. National Security Agency/Central Security Serv.*, 608 F.2d 1381, 1387 (D.C. Cir. 1979), *cert. denied*, 446 U.S. 937, 100 S.Ct. 2156, 65 L.Ed.2d 790 (1980); *Weissman v. CIA*, 565 F.2d 692, 697 (D.C. Cir. 1977). The guidelines set forth above were summarized most recently by this court in *Hayden v. National Security Agency/Central Security Serv.*, 608 F.2d 1381, 1384–88 (D.C. Cir. 1979), *cert. denied*, 446 U.S. 937, 100 S.Ct. 2156, 65 L.Ed.2d 790 (1980); and *Ray v. Turner*, 587 F.2d 1187, 1194–97 (D.C. Cir. 1978). Appellant argues that the case should be remanded to the district court for reconsideration of the Exemption 1 issue on the grounds that *Hayden* and *Turner* were issued during the pendency of this appeal. We find a remand unwarranted because the district court's review was fully adequate and consistent with the statutory requirements and principles set forth above.

In this instance, the district court relied primarily on the affidavit of Lewis L. Small, Special Agent of the FBI, in making its *de novo* determination.[51] The official averred that classification was imposed to protect material that would reveal intelligence cooperation with foreign governmental agencies [52] and to protect the identity of confidential intelligence sources, including: "sources operating in contact with a foreign establishment within the United States; sources who are either foreign nationals or American citizens having contact with foreign establishments or individuals in foreign countries; and sources who have penetrated a domestic organization which is controlled in whole or in part by a foreign power, and which is the target of a national security investigation." [53] The official explained that exposure of these confidential sources would "end their particular usefulness for gathering further intelligence" and would subject these individuals to the risk of retaliation.[54] Agent Small also stated that disclosure of those sources which have penetrated domestic organizations controlled by a foreign power would reveal one of the FBI's methods of infiltrating such organizations.[55] Finally, the official explained that the materials pertaining to intelligence cooperation between foreign police agencies and the FBI were classified at the specific instruction of these foreign agencies. Future intelligence cooperation would be impaired, Agent Small asserted, if the Department failed to honor its agreement to hold this information in strict confidence.[56]

█ We are persuaded that the affidavit of Agent Small provided the district court with a sufficient basis to make a reasoned *de novo* decision. Contrary to appellant's contention, this is not an instance in which the description of the documents provided in the Department's affidavit is too vague. The affidavit describes with reasonable specificity the nature of the documents at issue and the potential harm that would follow from disclosure of the information. A more particularized description of the type of intelligence source involved, *i. e.*, a businessman or a foreign diplomat, could in itself reveal the sensitive nature of the information at issue. Likewise, a more precise indication of the type of intelligence cooperation between foreign governmental agencies and the FBI would not only violate the agreement to maintain this information in confidence, and thus disclose the sensitive nature of the materials, but also reasonably could be expected to impair future intelligence exchanges as a result.

Nor do we find the scope of the term "intelligence source" too sweeping. It does not encompass the ordinary citizen with ordinary contacts abroad, as appellant suggests,[57] but instead is confined to those individuals who have gathered intelligence for the FBI under a strict mantle of secrecy.[58] Disclosure of the identity of these sources reasonably could be expected to end their particular usefulness for gathering intelligence or subject them to some form of retaliation.

51. Affidavit of Lewis L. Small (11 May 1978), *reprinted in* J.A. at 84. This affidavit was submitted in support of the Department's motion for summary judgment. As part of its response to appellant's *Vaughn* motion, the Department had submitted an affidavit that described briefly which documents were classified and the reasons for classification. *See* Affidavit of William N. Preusse (1 Feb. 1978), *reprinted in* J.A. at 56. This affidavit was supplanted by the affidavit of Special Agent Small.

52. Affidavit of Lewis L. Small at 4 (11 May 1978), *reprinted in* J.A. at 84, 87.

53. *Id.* at 3, J.A. at 86.

54. *Id.*

55. *Id.* at 4, J.A. at 87.

56. *Id.*

57. Appellant baldly asserts that the term "intelligence sources" "encompasses, among others, any journalist, politician, or citizen who has contacted an embassy, foreign newspaper office, or other 'foreign establishment' in the United States; a priest in contact with the Vatican; anyone who ever wrote, phoned, telegrammed or visited someone in a foreign country." Brief for Appellant at 36.

58. *See* Affidavit of Lewis L. Small at 3 (11 May 1978), *reprinted in* J.A. at 84, 86.

■ Finally, with respect to certain of the documents withheld under Exemption 1, appellant argues that the Department did not sustain its burden of proving that the documents logically fit within the claimed exemption. Specifically, appellant asserts that the materials from Appendix C to the Task Force Report that contain summaries of the FBI's surveillance records and tapes of Dr. King can have no possible connection with national defense or foreign policy, but instead must relate solely to the FBI's systematic program to harass Dr. King. Instead of granting summary judgment to the Department on the basis of the affidavits, it is urged, the district court should have reviewed these Task Force documents *in camera*. We find that the district court acted within its discretion to grant summary judgment to the Department without conducting an *in camera* inspection of the documents.

Although the FBI's surveillance of Dr. King strayed beyond the bounds of its initial lawful security aim,[59] that does not preclude the possibility that the actual surveillance documents—and the Task Force materials that comment upon those documents—may nevertheless contain information of a sensitive nature, the disclosure of which could compromise legitimate secrecy needs. In this case, Special Agent Small averred that disclosure of the Task Force summaries would reveal an intelligence source. We carefully have examined his statement as well as the challenging affidavits submitted by appellant. The sufficiency or accuracy of the information contained in the affidavit of Agent Small has not been undermined by any evidence of agency bad faith or by any concrete evidence in the record to the contrary; the bare assertion that the Task Force summaries cannot contain information of a sensitive nature because the overall purpose of the FBI's original investigation of Dr. King was unrelated to a legitimate national security aim will not suffice. Affording "substantial weight" to the uncontroverted agency affidavit as we must, we conclude that the trial court properly determined that the documents were classified in accordance with the substantive terms of the claimed exemption.

### 3. *Procedural Criteria Established by Executive Order No. 11,652*

■ To be classified properly, a document must be classified in accordance with the procedural criteria of the governing Executive Order as well as its substantive terms.[60] In this instance, the Department satisfied all the relevant procedural criteria[61] with the exception of the following provision set forth in the directive implementing Executive Order No. 11,652: "At the time of origination, each document or other material containing classified information shall be marked with its assigned security classification and whether it is subject to or exempt from the General Declassification Schedule."[62] This directive re-

59. *See, e. g.*, Murphy Report, *supra* note 3, at 138.

60. *See, e. g.*, S.Rep. No. 1200, 93d Cong., 2d Sess. 11–12 (1974).

61. We reject appellant's contention that an additional warning notice was required to be placed on the expurgated pages that contain information relating to intelligence sources and methods. The directive implementing Executive Order No. 11,652 requires a warning notice, in addition to the classification marking, only for *sensitive* intelligence sources and methods to further limit the dissemination of this type of information. *See* National Security Council Directive of 17 May 1972 Governing the Classification, Downgrading, Declassification and Safeguarding of National Security Information IV(H)(4), 37 Fed.Reg. 10,053, 10,059

(1972). The word "sensitive," as it is used in the directive, is a term of art; clearly materials containing intelligence sources and information may be "classified" yet not "sensitive." Special Agent Small averred that the sources and methods contained in the documents involved in this case were not sensitive. Supplemental Affidavit of Lewis L. Small at 3 (22 May 1978), *reprinted in* J.A. at 191, 193. No evidence to the contrary was presented; we therefore find that the materials did not require the special warning notice.

62. National Security Council Directive of 17 May 1972 Governing the Classification, Downgrading, Declassification and Safeguarding of National Security Information IV(A), 37 Fed. Reg. 10,053, 10,056–57 (1972). Section 7(A) of Executive Order No. 11,652 provides that "[t]he

quires the assignment of security classification and appropriate markings at the time the documents containing classified information are generated. Although the relevant portions of the two Civil Rights Division memoranda were classified at the time of their origination,[63] the pertinent portions of Appendix A and Appendix C to the Task Force Report were classified belatedly.[64] The district court found that the belated classification of the documents was an "atypical slip-up" which did not undermine the claimed exemption.[65]

Citing this court's decision in *Halperin v. Department of State*,[66] appellant contends that either the documents should be released immediately or the case first should be remanded to the district court for *in camera* inspection to determine whether disclosure of the materials would cause grave damage to the national security. We find this contention unpersuasive.

In *Halperin* this court found that the case should be remanded to the district court for *in camera* inspection of the document in dispute and possible disclosure thereafter because the agency had failed to classify the document at the time of origination in compliance with the directive implementing Executive Order No. 11,652 *and* because the agency had failed to follow the proper *substantive* standards as well.[67] Thus *Halperin* did not resolve expressly the question with which we are faced: whether the failure to classify a document at the time of origination, standing alone, forever bars classification of the document under Executive Or-

der No. 11,652. We do not believe that *Halperin* fairly implies this result; nor do we think that that result is a sensible one.

Although the agency in *Halperin* not only failed to comply with the procedural requirements but also the *substantive* standards of Executive Order No. 11,652, this court did not order the release of the documents forthwith.[68] We recognized that such a course could have intolerable consequences for national security interests. In this case, the affidavits clearly indicate that the documents fit within the substantive standards of Executive Order No. 11,652; that is, the materials do indeed contain information, the disclosure of which could compromise legitimate secrecy needs. To release these materials because of a mere mishap in the *time* of classification, when the documents are sworn to contain sensitive information, would only be perverse.

We might add that the current Executive Order, Executive Order No. 12,065, contains a provision that prevents such an absurd result from ever occurring. Executive Order No. 12,065 expressly provides for classification at times later than the origination of the document.[69] This classification scheme is eminently more practical than that provided under Executive Order No. 11,652: some documents when first generated may not contain any information of a sensitive nature; yet the information set forth in this same document later may require the utmost secrecy and protection as a

National Security Council shall monitor the implementation of this order." Exec. Order No. 11,652, § 7(A), 3 C.F.R. 375, 383 (1973). Pursuant to this authority, the National Security Council issued its directive of 17 May 1972 supplementing Executive Order No. 11,652.

**63.** On administrative review, certain portions of the Murphy Report and Pottinger Memorandum were declassified and released to appellant; other segments were reclassified as "Top Secret." *See* Affidavit of Lewis L. Small at 34 (11 May 1978), *reprinted in* J.A. at 84, 117.

**64.** Most of the Appendix A materials were classified on 17 January 1977 and some were not classified until 25 October 1977, several months after appellant's FOIA request was filed. Many of the Appendix C materials were classi-

fied in May 1977; the remainder were classified in December 1977 and January 1978.

**65.** *Lesar v. United States Dep't of Justice*, 455 F.Supp. 921, 925 (D.D.C.1978).

**66.** 565 F.2d 699 (D.C. Cir. 1977).

**67.** *Id.* at 703–07.

**68.** *Id.* at 704–05 ("veteran State Department employee making the classification was wholly unaware of the relevant and governing classification standards at the time he acted").

**69.** *See, e. g.*, Exec. Order No. 12,065, § 1–606, 3 C.F.R. 190, 194–95 (1979).

result of changed domestic and international circumstances.[70]

Nor do we think that a remand to the district court for *in camera* inspection is necessary in this case. The affidavit submitted and reviewed by the district court provided the court with sufficient means to ascertain that the requisite harm could occur if the materials were disclosed. A remand to the district court thus would be a useless exercise. We realize that in *Halperin* the court required the district court on remand to ascertain whether the release of the materials would cause grave damage to the national security, a standard somewhat akin to the substantive criteria for classifying documents as "Top Secret" under Executive Order No. 11,652.[71] We think that this heightened form of scrutiny is highly inappropriate in cases, unlike *Halperin*, in which the affidavits indicate that the *substantive* standards of the governing Executive Order have been followed. Otherwise, for materials classified either as "Secret" or "Confidential," applying a heightened scrutiny would lead to the anomalous result of directing the release of those materials even though the intent of the Executive is expressly to the contrary.

In sum, we do not mean to imply that only the substantive standards of the governing Executive Order must be followed: the statute requires both procedural and substantive conformity for proper classification.[72] Rather we recognize that the consequences of particular violations may vary; some substantive violations may require either a remand to the district court for *in camera* inspection of the materials or the release of the documents. For procedural violations, some may be of such importance to reflect adversely on the agency's overall classification decision, requiring a remand to the district court for *in camera* inspection; while others may be insignificant, undermining not at all the agency's classification decision. We believe that the procedural violation involved in this case plainly falls within the latter category.[73]

### B. *Exemption 2*

■■■■■ Exemption 2 of the FOIA exempts from disclosure matters that are "related solely to the internal personnel rules and practices of an agency."[74] This exemption applies to "routine matters" of "merely internal significance" in which the public lacks any substantial or legitimate interest.[75] The materials claimed to fall within this exemption are symbols used to refer to FBI informants in FBI documents and records. Relying on Exemptions 2 and 7(D) of the FOIA, the Department deleted these markings from certain of the records released to appellant from Appendix C to the Task Force Report. Judge Gesell sustained the exemption under subsection 2.[76]

We also find that the informant codes plainly fall within the ambit of Exemption 2. The means by which the FBI refers to informants in its investigative files is a matter of internal significance in which the

---

70. *See also* notes 41–43 *supra* and accompanying text.

71. *See* note 45 *supra* and accompanying text.

72. *See, e. g.*, S.Rep. No. 1200, 93d Cong., 2d Sess. 11–12 (1974); *Hayden v. National Security Agency/Central Security Serv.*, 608 F.2d 1381, 1387 (D.C. Cir. 1979), *cert. denied*, 446 U.S. 937, 100 S.Ct. 2156, 65 L.Ed.2d 790 (1980).

73. We also note that the Department explained that the Task Force members were not aware of the requirement that documents were to be classified at the time of origination. The Task Force was created for the specific purpose of reviewing FBI and Department files on Dr. King and was not therefore a permanent body

steeped in the knowledge of agency rules and practices. While we are troubled somewhat by the Department's failure to educate the Task Force personnel in this matter, we think the "atypical slip-up" may be excused.

74. 5 U.S.C. § 552(b)(2) (1976).

75. *Department of the Air Force v. Rose*, 425 U.S. 352, 369–70, 96 S.Ct. 1592, 1603, 48 L.Ed.2d 11 (1976); *Jordan v. United States Dep't of Justice*, 591 F.2d 753, 759–71 (D.C. Cir. 1978) (en banc); *Vaughn v. Rosen*, 523 F.2d 1136, 1141 (D.C. Cir. 1975).

76. *Lesar v. United States Dep't of Justice*, 455 F.Supp. 921, 925 (D.D.C.1978).

public has no substantial interest.[77] These symbols bear no relation to the substantive contents of the records released to appellant. Their only real value lies in their use as a mechanism to control the internal and external dissemination of the actual identities of FBI informants. Since the public has no legitimate interest in gaining information that could lead to the exposure of confidential sources referred to in criminal investigative files,[78] we uphold the claimed exemption.

### C. Exemption 7(C)

■ Exemption 7(C) permits an agency to withhold "investigatory records compiled for law enforcement purposes, but only to the extent that the production of such records would . . . constitute an unwarranted invasion of personal privacy."[79] To determine whether this exemption is applicable, the district court must conduct a *de novo* review, balancing the privacy interest at stake against the public interest in disclosure.[80]

At issue under this exemption are deletions from pages of the Murphy Report and Pottinger Memorandum released to appellant and from pages of the three appendices to the Task Force Report. The excised materials primarily consist of the names and other identifying information of persons involved in the King investigation, including informants and lower-level FBI personnel, as well as information of a personal nature, the disclosure of which allegedly could embarrass Dr. King's family and associates or damage their reputations. After examining the affidavits submitted[81] and the excerpted documents released to appellant, the district court sustained the exemption for these materials, finding that the privacy interest involved outweighed the public interest in disclosure.[82]

■ As a preliminary issue appellant contends that certain of the disputed materials do not qualify as records "compiled for law enforcement purposes." Appellant asserts that because the FBI's surveillance activities concerning Dr. King were unrelated to any legitimate law enforcement purpose, those portions of Appendix C to the Task Force Report that summarize the FBI surveillance records and tapes do not meet the threshold requirement set forth in Exemption 7. We find this contention unpersuasive.

If the documents in dispute were the actual FBI records relating to the Bureau's surveillance of Dr. King, we would have serious doubts whether these could be construed in their entirety as "investigatory records compiled for law enforcement purposes."[83] Although the original purpose

77. *See, e. g., Nix v. United States*, 572 F.2d 998, 1005 (4th Cir. 1978) (FBI routing stamps, cover letters, and secretary initials within ambit of Exemption 2); *Maroscia v. Levi*, 569 F.2d 1000, 1002 (7th Cir. 1977) (FBI's "administrative and mail routing stamps, and references to previous communications utilized to maintain control of an investigation" within ambit of Exemption 2).

78. *See* 5 U.S.C. § 552(b)(7)(D) (1976) (exempts information that would disclose the identity of a confidential source in investigatory records compiled for law enforcement purposes).

79. *Id.* (7)(C).

80. *See Department of the Air Force v. Rose*, 425 U.S. 352, 370–73, 96 S.Ct. 1592, 1603–1604, 48 L.Ed.2d 11 (1976). Exemption 7(C) and Exemption 6 run contrary to the theory of other exemptions. Here the court is called upon to balance the conflicting interests and values involved; in other exemptions Congress has struck the balance and the duty of the court is limited to finding whether the material is within the defined category.

81. *See* Supplemental Affidavit of James P. Turner ¶¶ 4, 6 (11 May 1978), *reprinted in* J.A. at 131, 133–34; Affidavit of Michael E. Shaheen ¶ 4, Index (1 Feb. 1978), *reprinted in* J.A. at 72, 77–78.

82. *Lesar v. United States Dep't of Justice*, 455 F.Supp. 921, 925 (D.D.C.1978).

83. This court has held that the law enforcement exemption may not be invoked in situations in which the agency lacks the inherent authority to conduct the investigation in question. *See Weissman v. CIA*, 565 F.2d 692, 694–96 (D.C. Cir. 1977) (CIA has no authority or power to conduct internal security investigations; law enforcement exemption thus inapplicable). We need not decide the question of whether the exemption is applicable in a situation in which the law enforcement agency is

behind the FBI's investigation of Dr. King appears to have been legitimate and undertaken in good faith,[84] the available evidence indicates that at some point this investigation wrongly strayed beyond its initial lawful scope and took on the nature of a campaign to harass and attempt to discredit Dr. King.[85] *It is the Task Force summaries, however, that are at issue in this case* and not the original surveillance records; the latter records were transmitted to the National Archives under seal for fifty years by order of the district court in *Lee v. Kelley*.[86]

*No claim is made that the Task Force materials were not compiled during the course of a legitimate law enforcement investigation.* Indeed, one of the specific purposes for which the Task Force was created was that of ascertaining whether the FBI's activities regarding Dr. King were improper or illegal.[87] To discharge this obligation effectively, the Task Force necessarily was required to review the FBI's surveillance records of Dr. King. We thus resist appellant's suggestion that we somehow should "pass through" the Task Force notes to the underlying FBI surveillance records and inquire further into the point at which the FBI's investigation of Dr. King strayed beyond its lawful scope. We hold that the documents at issue meet the threshold requirement of subsection 7.

Having resolved this initial question, we must consider whether the district court correctly found that the materials in question fell within the scope of Exemption 7(C). To recall briefly, these materials are of two types: the names and other identifying data of FBI agents and informants involved in the FBI's investigations of Dr. King and information allegedly of a personal nature concerning Dr. King's family and associates. Appellant first contends that the district court erred as a matter of law in sustaining the claimed exemption for the names of FBI agents because these agents, as public officials, have no legitimate privacy interest in their names. We disagree.

In their capacity as public officials FBI agents may not have as great a claim to privacy as that afforded ordinarily to private citizens, but the agent by virtue of his official status does not forgo altogether any privacy claim in matters related to official business. As several courts have recognized, these agents have a legitimate interest in preserving the secrecy of matters that conceivably could subject them to annoyance or harassment in either their official or private lives.[88]

Balancing the interests at stake, the district court found in this case that protection of the names of the FBI personnel involved in the King investigation was warranted in view of the contemporary character of the data.[89] Public identification of these individuals conceivably could subject them to annoyance or harassment; we discern no countervailing public interest in disclosing this information at this point. This is not to imply a blanket exemption for the names of all FBI personnel in all documents. Rather, we find that in this instance public

---

invested with the authority to initiate a particular investigation but later exercises this power without reference to any justifiable law enforcement purpose. Cf. *Kuehnert v. FBI*, 620 F.2d 662, at 665–666 (8th Cir. 1980) (law enforcement exemption extends to all investigative files of a criminal law enforcement agency; no showing of legitimate law enforcement purpose necessary); *Irons v. Bell*, 596 F.2d 468, 471–76 (1st Cir. 1979) (same).

**84.** *E. g.*, Murphy Report, *supra* note 3, at 145.

**85.** *E. g., id.* at 138.

**86.** Nos. 76–1185, 76–1186 (D.D.C. 31 Jan. 1977). *See* notes 17–18, 28 *supra* and accompanying text.

**87.** *See* Memorandum from Edward H. Levi, Attorney General, to Michael E. Shaheen, Counsel on Professional Responsibility, Department of Justice (26 Apr. 1976), *reprinted in* J.A. at 12.

**88.** *E. g., Nix v. United States*, 572 F.2d 998, 1005–06 (4th Cir. 1978); *Maroscia v. Levi*, 569 F.2d 1000, 1002 (7th Cir. 1977); *Pacheco v. FBI*, 470 F.Supp. 1091, 1098–99 (D.P.R.1979); *Malloy v. United States Dep't of Justice*, 457 F.Supp. 543, 546 (D.D.C.1978); *Ferguson v. Kelly*, 455 F.Supp. 324, 327 (N.D.Ill.1978).

**89.** *Lesar v. United States Dep't of Justice*, 455 F.Supp. 921, 925 (D.D.C.1978).

identification of the individuals involved in the FBI's investigation of Dr. King would constitute an unwarranted invasion of their privacy in light of the contemporary and controversial nature of the information.

Similarly, Judge Gesell determined that protection should be afforded the names and identifying data of informants involved in the King investigation: "Those cooperating with law enforcement should not now pay the price of full disclosure of personal detail." [90] We also think that the references to FBI informants properly could be deleted under subsection 7(C) to minimize the public exposure or possible harassment of these individuals as well.[91] While we recognize that this information may have some historical importance, the privacy interest at stake counsels against the release of this information at this time.

Finally, the district court held that the privacy exemption properly was invoked for information concerning Dr. King's family and associates.[92] Appellant claims that summary judgment for the Government was inappropriate on this issue because the affidavits submitted by the Department only vaguely stated the privacy interest involved.

We find that the excerpted documents and the affidavits submitted provided the district court with sufficient grounds to determine that disclosure of the materials would constitute an unwarranted invasion of the privacy of the individuals involved.

It is true that the Department's affidavits speak in somewhat general terms of the privacy interest at stake,[93] but, as the district court recognized, to initiate a further inquiry into the precise type of information contained in these records "would in the nature of things destroy the privilege, for the inquiry cannot be made without revealing the withheld information. It is difficult if not impossible, to anticipate all respects in which disclosure might damage reputations or lead to personal embarrassment and discomfort." [94] We thus sustain the district court's ruling that the documents properly were withheld under Exemption 7(C).

### D. Exemption 7(D)

Exemption 7(D) protects from disclosure "investigatory records compiled for law enforcement purposes, but only to the extent that the production of such records would . . . disclose the identity of a confidential source and, in the case of a record compiled by a criminal law enforcement authority in the course of a criminal investigation, . . . confidential information furnished only by the confidential source." [95] The materials claimed to fall within this exemption are Atlanta and Memphis police department records of the King assassination.[96] The Memphis police records were subpoenaed from the state prosecutor by the Task Force during its review of the King assassination; the At-

**90.** Id.

**91.** See, e. g., Maroscia v. Levi, 569 F.2d 1000, 1002 (7th Cir. 1977).

**92.** Lesar v. United States Dep't of Justice, 455 F.Supp. 921, 925 (D.D.C.1978).

**93.** See Supplemental Affidavit of James P. Turner, ¶¶ 4, 6 (11 May 1978), reprinted in J.A. at 131, 133–34; Affidavit of Michael E. Shaheen ¶ 4, Index (1 Feb. 1978), reprinted in J.A. at 72, 77–78.

**94.** Lesar v. United States Dep't of Justice, 455 F.Supp. 921, 925 (D.D.C.1978).

**95.** 5 U.S.C. 552(b)(7)(D) (1976).

**96.** The Atlanta and Memphis police department records comprise five volumes of Appendix C to the Task Force Report, Volumes XIII through XVII, and consist of some 29 pages for the Atlanta records and 400 pages for the Memphis documents. These records were withheld in their entirety, with the exception of 17 pages at the end of Volume XVII. According to the district judge, who reviewed these records in camera, the "Atlanta records detail various threats on the life of Dr. King by named individuals and tips or other information from Dr. King's entourage concerning threats or suspicious activity." The Memphis records "are far more voluminous since," according to Judge Gesell, "they cover the immediate investigation of the killing and subsequent investigation of leads and suspects." Lesar v. United States Dep't of Justice, 455 F.Supp. 921, 924 (D.D.C.1978).

lanta records were obtained by the Task Force from the FBI's Atlanta field office. The Atlanta police had provided this information for the FBI's use in its investigation of the assassination. After reviewing the affidavits presented and after examining the records *in camera*, the district court concluded that the exemption properly was invoked.[97]

 The principal issue with which we are faced is whether the term "confidential source" in Exemption 7(D) includes entities such as the state and local law enforcement agencies here involved or whether it instead is limited to individuals. Giving the word "source" its plain and ordinary meaning, it would appear simply to refer to the originator of information, encompassing within its scope nonfederal entities such as state, local, and foreign law enforcement agencies as well as individuals such as private citizens and paid informants. Appellant contends, however, that the legislative history of the exemption indicates that Congress intended to limit the term to human sources. Recently, the Ninth Circuit thoroughly considered this issue in *Church of Scientology v. United States Department of Justice*.[98] After examining the legislative history, we too are persuaded that Congress intended no such distinction in Exemption 7(D) between individual and institutional sources of information.[99] We thus sustain the plain meaning of the statutory exemption.

On 30 May 1974 Senator Hart introduced a proposal to amend Exemption 7 in relevant part to protect "investigatory records compiled for law enforcement purposes, but only to the extent that the production of such records would . . . disclose the identity of an *informer*."[100] Senator Hart explained that the amendment would protect

without exception and without limitation the identity of informers. It protects both the identity of informers and information which might reasonably be found to lead to such disclosure. These may be paid informers or simply concerned citizens who give information to enforcement agencies and desire their identity to be kept confidential.[101]

President Ford expressed concern that the proposal would not guard sufficiently the secrecy of sources of information or the actual information itself. He wrote that he was

concerned with any provision which would reduce our ability to effectively deal with crime. This amendment could have that effect if the sources of information or the information itself are disclosed. These sources and the information by which they may be identified must be protected in order not to severely hamper our efforts to combat crime.[102]

In response, the House and Senate Conference Committee substituted the words "confidential source" for the word "inform-

---

**97.** *Id.* No claim is made that the Memphis and Atlanta police records are not investigatory records "compiled for law enforcement purposes," and it is clear that these records meet this requirement. Exemption 7(D) was also invoked for portions of the Task Force notes on the FBI's surveillance of Dr. King. As to these documents, appellant makes the same claim advanced above that they do not meet the threshold requirement set forth in Exemption 7. For reasons already discussed, *see* notes 83–87 *supra* and accompanying text, we reject this contention and find that the notes were compiled during the course of a lawful investigation within the meaning of Exemption 7.

**98.** 612 F.2d 417 (9th Cir. 1979).

**99.** *Id.* at 427 ("confidential source" includes foreign, state, and local law enforcement agencies). *Accord, Nix v. United States*, 572 F.2d

998, 1005 (4th Cir. 1978); *Church of Scientology v. Gray*, No. 76–1165, slip op. at 3–4 (D.D.C. 1 Apr. 1980); *Pacheco v. FBI*, 456 F.Supp. 1024, 1032 (D.P.R.1978). *Contra, Church of Scientology v. Miller*, No. 75–1471, slip op. at 4–7 (D.D.C. 17 Apr. 1980) ("confidential source" limited to individuals); *Ferguson v. Kelly*, 455 F.Supp. 324, 327 (N.D.Ill.1978) (same).

**100.** 120 Cong.Rec. 17,014, 17,033 (1974) (emphasis added).

**101.** *Id.* at 17,034.

**102.** Letter from Gerald R. Ford to Senator Edward Kennedy (20 Aug. 1974), *reprinted in* 120 Cong.Rec. 33,157, 33,158 (1974).

er" and added language to secure the secrecy of information obtained from a confidential source by a criminal law enforcement authority in the course of a criminal investigation. The Conference Report described the changes as follows:

> The substitution of the term "confidential source" in section 552(b)(7)(D) is to make clear that the identity of a person other than a paid informer may be protected if the person provided information, under an express assurance of confidentiality or in circumstances from which such an assurance could be reasonably inferred. Under this category, in every case where the investigatory records sought were compiled for law enforcement purposes—either civil or criminal in nature—the agency can withhold the names, addresses, and other information that would reveal the identity of a confidential source who furnished the information. However, where the records are compiled by a criminal law enforcement authority, *all* of the information furnished only by a confidential source may be withheld if the information was compiled in the course of a criminal investigation.[103]

The amendment went into effect on 19 February 1975.[104]

The term "confidential source" is not defined explicitly in the statute or the legislative history. Appellant contends that the use of the word "person" in the Conference Committee Report quoted above indicates that Congress intended to restrict the scope of the term to human sources. The Committee's passing reference to the word "person," standing alone, is in no way dispositive of congressional intent.[105] In legal terminology the word "person" often includes not only natural persons but various entities such as corporations or partnerships as well.[106] Based on the purpose of Exemption 7(D), we agree with the Ninth Circuit that the word "person" in this instance was used in the general sense of a collective noun and that it restricts not at all the types of sources protected.[107]

In revising and broadening the language of Senator Hart's original proposal, the Conference Committee acted to ensure the secrecy of both the identities of confidential sources and all information furnished during the course of a criminal law enforcement investigation. Congress shared President Ford's concern that if the confidentiality of criminal investigatory files could not be guaranteed, law enforcement agencies might lose their sources of information. If this were to occur, so Congress believed, the effective ability of law enforcement personnel to investigate and deal with crimes would be reduced significantly. As one Senator explained in support of the amendment, "without such protection, law enforcement agencies would be faced with a 'drying-up' of their sources of information and their criminal investigative work would be seriously impaired."[108]

103. S.Rep. No. 1200, 93d Cong., 2d Sess. 13 (1974), U.S.Code Cong. & Admin.News 1974, p. 6291 (Conference Report) (emphasis in original).

104. The 1974 amendments to the FOIA were passed over a presidential veto. *See also* note 108 *infra.*

105. Senator Kennedy stated in conjunction with the amendment to Exemption 7(D) that: "[W]e also provided that there be no requirement to reveal not only the name of a confidential source, but also any information obtained from *him* in a criminal investigation." 120 Cong.Rec. 36,865, 36,874 (1974) (emphasis added). Surely no one would interpret Senator Kennedy's casual reference to the word "him" to mean that only male sources are to be protected. In the absence of an explicit indication in the legislative history to the contrary, we are inclined to view the use of the word "person" in the Conference Committee Report in much the same light as we view Senator Kennedy's choice of words.

106. *E. g.,* Black's Law Dictionary 1028 (5th ed. 1979).

107. *See Church of Scientology v. United States Dep't of Justice,* 612 F.2d 417, at 426 (9th Cir. 1979).

108. 120 Cong.Rec. 36,865, 36,877 (1974) (remarks of Sen. Robert Byrd). This remark was made during the deliberations over whether to override the presidential veto of the 1974 FOIA amendments. Several members of the Conference Committee also stated in these delibera-

In view of Congress's close attention to the concern that the investigatory functions of criminal law enforcement agencies not be impeded, it seems clear that Congress could not have intended to draw a distinction between individual and institutional sources of information. To construe the term "confidential source" to include only persons would create a significant gap in the scope of protection afforded the files of a criminal law enforcement agency. If the enforcement authority could not assure that information furnished by entities such as state and local law enforcement agencies would remain confidential, it would be confronted with the possibility of losing these valuable sources of information—and, as a consequence, the federal agency's investigatory operations would be affected adversely. This is precisely the result that Congress unequivocally sought to avoid.

From our reading of the legislative history, then, we are persuaded that Congress did not intend to distinguish among the types of sources, afforded protection under Exemption 7(D). Rather, we think that Congress intended generally to extend protection to whatever source of information the criminal law enforcement authority might employ during the course of an investigation. We hold therefore that the word "source" in Exemption 7(D) includes not only individuals such as private citizens and paid informants but also entities such as the state and local law enforcement agencies here involved.

Appellant next argues that even if nonfederal state and local law enforcement agencies fit within the definition of the word "source," the bulk of the records furnished by the Memphis and Atlanta police departments are not "confidential." As a result of court proceedings, news leaks, and other FOIA requests, appellant asserts, much of the information in dispute is within the public domain, and the district court therefore erred in granting summary judgment to the Department on this issue. We disagree.

The affidavits submitted by the Department aver that the Memphis and Atlanta police records were provided to the Task Force with the explicit understanding that these documents would remain confidential.[109] Assuming arguendo that some of the information in these records has found its way into the public domain by one means or another, that does not alter the fact that this information originally was obtained in confidence. No waiver of confidentiality has occurred. The cooperating agencies, to which the right to claim the privilege belongs, have not only supplied the information in confidence originally, but, by affidavits have continued to object to the disclosure of these records.[110]

Finally, appellant contends that the affidavit submitted in response to the *Vaughn v. Rosen* motion [111] was defective

tions that they had acted to assuage President Ford's concern that the exemption, as originally proposed, would not protect sufficiently the confidential files of criminal law enforcement agencies. For example, Senator Kennedy remarked: "We have been most careful to protect . . . law enforcement interests to be utmost in the bill we passed." *Id.* at 36,866–67. (remarks of Sen. Kennedy). Also, Senator Hart stated: "One of the reasons given by the President for his veto is that the investigatory files amendment which I offered would hamper criminal law enforcement agencies in their efforts to protect confidential files. We made major changes in the conference to accommodate this concern." *Id.* at 36,871 (remarks of Sen. Hart).

**109.** Affidavit of Hugh W. Stanton (22 May 1978), *reprinted in* J.A. at 194; Affidavit of

Horace P. Beckwith (22 May 1978), *reprinted in* J.A. at 189; Affidavit of James F. Walker (10 May 1978), *reprinted in* J.A. at 125.

**110.** *See* Affidavit of Horace P. Beckwith (22 May 1978) (Atlanta records), *reprinted in* J.A. at 189. The Memphis records were made available to the Task Force only after they were subpoenaed from the Shelby County Attorney General. After being notified of appellant's FOIA request, the Shelby County Attorney General refused to consent to the release of the records. *See* Affidavit of Hugh W. Stanton (22 May 1978) (District Attorney General, Shelby County, Tenn.), *reprinted in* J.A. at 194.

**111.** 484 F.2d 820 (D.C. Cir. 1973), *cert. denied*, 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974).

with respect to its treatment of the police records: the affidavit identified which volumes in Appendix C to the Task Force Report contain the police records, but it did not provide a detailed index for these records.[112] We find a detailed justification for the police records unnecessary in this case.

Exemption 7(D) differs from other FOIA exemptions in that its applicability depends not on the specific factual contents of a particular document; instead, the pertinent question is whether the information at issue was furnished by a "confidential source" during the course of a legitimate criminal law investigation.[113] Once that question is answered in the affirmative, all such information obtained from the confidential source receives protection.[114] The affidavit makes clear for which documents the exemption was invoked. We think that this explanation suffices, especially in view of the fact that the district court examined all of the records *in camera* and determined that the documents were indeed of the nature alleged.[115]

### III. CONCLUSION

In conclusion, the judgment of the district court is

*Affirmed.*

BAZELON, Senior Circuit Judge, concurring:

I write separately only to highlight two troubling issues.

First, appellant claimed that Exemption 1 of the Freedom of Information Act (FOIA), 5 U.S.C. § 552 (1976), should not apply to agency materials produced without a lawful purpose. As I read Judge Wilkey's thoughtful opinion, this claim is not foreclosed in some future case. It is merely rejected here because 1) an affidavit adequately demonstrates the sensitivity of the contested materials and the legitimate security needs served by nondisclosure; and 2) there is no evidence of bad faith by the agency in its decision to withhold the documents. *See* Majority Opinion, at 483.

Second, appellant claimed that surveillance records generated through an agency investigation that strayed beyond its lawful scope should not be shielded from disclosure merely because they have been appended to the report of a subsequent, legitimate inquiry. *See* Majority Opinion, 487. Critical to the court's rejection of this claim here is the fact that the original surveillance records are not themselves sought by appellant and the subsequent investigation does fulfill legitimate law enforcement purposes. Only notes describing the original documents, notes produced by investigators in the subsequent agency inquiry, were included in the requested appendix. *Id.* Thus, the court has not reached the question of whether a subsequent agency investigation can engulf and subsume records from a prior illegitimate agency action for the purposes of the Freedom of Information Act. This question points to a two-pronged risk. First, agencies may seek through a subsequent secret report to shield from public access materials that by themselves deserve no protection under FOIA. Secondly, the opposite danger could ensue: private parties may successfully obtain access to protected materials simply because they have been incorporated into a subsequent, unprotected agency document. Resolution of the tensions between these risks and the purposes of FOIA must await another day.

---

112. *See* Affidavit of Michael E. Shaheen ¶ 5, Index (1 Feb. 1978), *reprinted in* J.A. at 72, 78.

113. *Cf. Goland v. CIA*, 607 F.2d 339, 350 & n.65 (D.C. Cir. 1978) (under Exemption 3 "detailed factual contents of specific documents" not important; "sole issue for decision is the existence of a relevant statute and the inclusion of withheld material within that statute's coverage"), *cert. denied*, 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980).

114. *See* S.Rep. No. 1200, 93d Cong., 2d Sess. 13 (1974) (Conference Report); 120 Cong.Rec. 36,-865, 36,871 (1974) (remarks of Sen. Hart: the law enforcement agency "can provide blanket protection for any information supplied by a confidential source"; agency need only "state that the information was furnished by a confidential source and it is exempt").

115. *Lesar v. United States Dep't of Justice*, 455 F.Supp. 921, 924 (D.D.C.1978).