Leslie R. WEATHERHEAD,
Plaintiff–Appellant,

v.

UNITED STATES of America; Department of Justice; United States Department of State, Defendants–Appellees.

No. 96–36260.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 8, 1998.

Decided Oct. 6, 1998.

Gregory J. Workland, Spokane, WA, for plaintiff-appellant.

Leslie R. Weatherhead, Witherspoon, Kelley, Davenport & Toole, Spokane, WA, pro se.

John P. Schnitker, United States Department of Justice, Washington, DC, for defendants-appellees.

Before HUG, Jr., Chief Judge, REINHARDT and SILVERMAN, Circuit Judges.

HUG, Chief Judge.

Appellant Leslie R. Weatherhead ("Weatherhead") appeals under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. The request sought a letter from the British Foreign Office to the United States Department of Justice ("Justice") related to the extradition of Sally Croft and Susan Hagan. The United States Department of State ("State Department") withheld the letter under FOIA Exemption 1, which protects classified information from disclosure. 5 U.S.C. § 552(b)(1). The district court initially ordered the letter's disclosure. The government sought reconsideration of that decision, which the district court granted after conducting *in camera* review and concluding that the letter contained "highly sensitive and injurious material." We have jurisdiction under 28 U.S.C. § 1291, and we reverse.

### BACKGROUND

On November 29, 1994, Weatherhead sent identical requests under FOIA to Justice and the State Department seeking a letter dated July 28, 1994 from the British Foreign Office to George Proctor, Director of the Office of International Affairs, Criminal Division, Justice. The letter was related to the extradition of two women, Sally Croft and Susan Hagan, from the United Kingdom to the United States to stand trial for conspiracy to murder the United States Attorney for Oregon. Croft and Hagan were members of the controversial Rajneeshpuram commune in Central Oregon in the 1980's. Believing that the letter contained an official British request that Justice take measures to avoid prejudice to Croft and Hagan in the district where the *Croft* case was pending, Weatherhead, the lawyer who represented Croft, intended to provide the letter to the district judge presiding over the *Croft* case.

On May 4, 1995, the State Department wrote to say that it had been unable to locate the letter. Two weeks later, Justice reported that it had found the letter, but since it had been created by a foreign government, the letter was forwarded to the State Department's FOIA office for review and response. Weatherhead administratively appealed Justice's failure to produce the letter to Justice's

Office of Information and Privacy, which remanded the matter so that the Criminal Division, in consultation with the State Department, could determine if the letter should be released. On August 4, 1995, the State Department sent a letter to the British government which stated that it had received a request for the letter, but "[b]efore complying with this request, [it] would appreciate the concurrence of [the British] government in the release of the document" and to know if it wanted any portions of the letter withheld.

On October 18, 1995, the British government responded that it was "unable to agree" to the letter's release because "the normal line in cases like this is that all correspondence between Governments is confidential unless papers have been formally requisitioned by the defence." It continued, "In this particular case, requests from representatives of the defendants for sight of the letter have already been refused on grounds of confidentiality." The State Department classified the letter on October 27, 1995. On December 11, 1995, the State Department advised Weatherhead that it had concluded that the letter contained confidential information that was properly classified in the interest of foreign relations and therefore would be withheld under FOIA Exemption 1.

### PROCEDURAL HISTORY

Weatherhead initiated a suit to compel production of the letter on November 17, 1995 and moved for summary judgment on February 16, 1996. The district court granted Weatherhead's motion for summary judgment, holding that the government failed to demonstrate that the letter was properly classified under Executive Order 12958. The government moved to set aside the judgment under Fed.R.Civ.P. 59(e). Even though it rejected most of the government's arguments for withholding the letter, the district court granted the government's motion for reconsideration.

The court chose to review the letter *in camera* out of concern that "highly sensitive and injurious material might be released only because defendants were unable to articulate a factual basis for their concerns without giving away the information itself." The court went on:

> That proved to be the case. When the Court read the letter, it knew without hesitation or reservation that the letter could not be released. The Court is unable to say why for the same reason defendants were unable to say why. The letter is two pages long, tightly written, and there is no portion of it which could be disclosed without simultaneously disclosing injurious materials.

Thus, the district court concluded that the letter should be withheld and that Weatherhead would have to be satisfied with "the solace of knowing that not only do two high ranking [Department of State] officers believe disclosure of the subject material injurious to the national interest, but so does an independent federal judge."

On October 16, 1996, Weatherhead filed a motion to set aside the September 9, 1996 decision under Fed.R.Civ.P. 60(b)(6). With this motion, he submitted an affidavit in which he claimed an acquaintance had spoken to a person "employed by the English government" who had disclosed the letter's contents to the acquaintance over the phone. Weatherhead included the information he learned from the acquaintance about the letter's contents in his affidavit. Plaintiff then claimed that the contents of the letter were in the public domain and must be disclosed. The district court denied Weatherhead's 60(b) motion and he did not file an appeal from that ruling to this court. Instead, he directly appeals the district court's grant of the government's motion for reconsideration.

### STANDARD OF REVIEW

We apply a two-step standard of review in an appeal from the grant of summary judgment in a FOIA case. *See Schiffer v. FBI*, 78 F.3d 1405, 1409 (9th Cir.1996). We first determine whether the district court had an adequate factual basis for its decision. *See id.* Where the parties do not dispute that the court had an adequate factual basis for its decision, as is the case here since the district court had the actual letter, we review the district court's factual findings underlying its decision for clear error. *See id.* We

review *de novo* the district court's determination that a requested document is exempt from disclosure under FOIA. *See id.*

### DISCUSSION

■ "The Freedom of Information Act, 5 U.S.C. § 552, mandates a policy of broad disclosure of government documents." *Maricopa Audubon Soc. v. United States Forest Serv.*, 108 F.3d 1082, 1085 (9th Cir.1997) (quoting *Church of Scientology v. Department of the Army*, 611 F.2d 738, 741 (9th Cir.1980)). When a request is made, an agency may withhold a document, or portions thereof, only if the information at issue falls within one of the nine statutory exemptions contained in § 552(b). *Maricopa Audubon Soc.*, 108 F.3d at 1085; *Kamman v. IRS*, 56 F.3d 46, 48 (9th Cir.1995). These exemptions are to be narrowly construed. *Id.* The burden is on the government to prove that a particular document is exempt from disclosure. *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152, 110 S.Ct. 471, 107 L.Ed.2d 462 (1989); *Maricopa Audubon Soc.*, 108 F.3d at 1085; *Kamman*, 56 F.3d at 48.

The government relies on Exemption 1, 5 U.S.C. § 552(b)(1), which exempts from FOIA disclosure "matters that are ... (1)(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order."

Executive Order No. 12958 ("EO 12958"), 60 Fed.Reg. 19825 (April 20, 1995), is at issue in this case. EO 12958 requires four conditions for classification: (1) the information must be classified by an "original classification authority"; (2) the information must be

"under the control of" the government; (3) the information must fall within one of the authorized withholding categories under this order; and (4) the original classification authority must "determine[ ] that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security" and must be "able to identify or describe the damage." § 1.2(a).

The first three conditions for classification are not at issue here. Weatherhead never contested that the State Department is an "original classification authority" or that the requested letter is "under the control" of the government. Weatherhead initially contested the third condition, whether the letter fell within an authorized withholding category, but on appeal has not challenged the district court's conclusion that the letter is information concerning "foreign relations or foreign activities of the United States," § 1.5(d).[1]

■ Weatherhead does argue that the government has not shown that the withheld letter satisfies the fourth condition required for classification. Pursuant to EO 12958, § 1.2(a)(4), the original classification authority must "determine[ ] that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security" and must be "able to identify or describe the damage."[2] "[D]amage to the national security" is "harm to the national defense or foreign relations of the United States from the unauthorized disclosure of information, to include the sensitivity, value, and utility of that information." EO 12958 § 1.1(1).

■ The government bears the burden of showing that the withheld letter meets the exemption requirements of EO 12958

---

1. The district court assumed that the letter involved foreign relations and fell within classification category § 1.5(d) because "the fundamental function of the [State Department] is to oversee foreign relations." Because Weatherhead did not contest this finding in his appellate briefs, he has waived this point on appeal. *See Hillis Motors, Inc. v. Hawaii Auto. Dealers' Ass'n*, 997 F.2d 581, 584 n. 4 (9th Cir.1993); *TAAG Linhas Aereas de Angola v. Transamerica Airlines, Inc.*, 915 F.2d 1351, 1353 n. 1 (9th Cir.1990).

2. Under the prior Executive Order, such a showing was not required since the "[u]nauthorized

disclosure of foreign government information is presumed to cause damage to national security." EO 12356 § 1.3(c). The district court pointed out that if the government had not delayed for so long in processing this FOIA request, the request would have been analyzed under the prior Order. The governing executive order is the one in effect when the classification decision is made. *See Lesar v. United States Dept. of Justice*, 636 F.2d 472, 479–80 (D.C.Cir.1980). In this case, the letter was classified on October 27, 1995. Therefore, EO 12958 applies.

§ 1.2(a)(4). 5 U.S.C. § 552(a)(4)(B); *John Doe Agency,* 493 U.S. at 152, 110 S.Ct. 471. The government must give a "particularized explanation of how disclosure of the particular document would damage the interest protected by the claimed exemption." *Wiener v. FBI,* 943 F.2d 972, 977 (9th Cir.1991). To meet its burden, the government must offer oral testimony or affidavits that are "detailed enough for the district court to make a *de novo* assessment of the government's claim of exemption." *Maricopa Audubon Soc. v. United States Forest Serv.,* 108 F.3d 1089, 1092 (9th Cir.1997) (quoting *Doyle v. FBI,* 722 F.2d 554, 555–56 (9th Cir.1983)). The purposes of requiring this showing are to "restore the adversary process to some extent, and to permit more effective judicial review of the agency's decision." *Id.* at 977–78. The first purpose is still subject to serious obstacles. A plaintiff seeking production of a document under FOIA is handicapped in this endeavor by the fact that only the agency truly knows the content of the withheld material. "Effective advocacy is possible only if the requester knows the precise basis for the nondisclosure." *Id.* at 979. The second purpose is, however, easier to accomplish-through *in camera* review. *In camera* review by the district court is appropriate in certain cases, where the government's public description of a document may reveal the very information that the government claims is exempt from disclosure. *Doyle,* 722 F.2d at 556. *Ex parte in camera* review is, of course, a last resort, given that it furthers judicial review but abrogates the adversary process to a significant extent.[3] *See National Wildlife Fed'n v. United States Forest Serv.,* 861 F.2d 1114, 1116 (9th Cir.1988) (*in camera* review, as a last resort, can also provide an adequate basis for decision). Still, in certain FOIA cases that form of inquiry may be essential if the courts are to fulfill their proper role. *See Pollard v. F.B.I.,* 705 F.2d 1151, 1153–54 (9th Cir.1983) ("*[I]n camera,* ex parte review remains appropriate in certain FOIA cases, provided the preferred alternative to *in camera* re-

view-government testimony and detailed affidavits-has first failed to provide a sufficient basis for decision.").

Weatherhead argues that the government never met its burden of identifying or describing any damage to national security that will result from release of the letter. We agree. In support of its decision to classify the withheld letter, the government submitted three declarations: that of Marshall R. Williams, which we will not discuss here, as it simply outlined the classification process; that of Peter M. Sheils, Acting Director of the State Department's Office of Freedom of Information, Privacy, and Classification Review; and that of Patrick Kennedy, Assistant Secretary for the Administration of the State Department. Mr. Sheils and Mr. Kennedy focus on two potential causes of damage to the national security: damage caused by the act of disclosing a letter between foreign governments, regardless of its particular contents, and damage caused because the letter concerns international extradition proceedings.

In his declaration, Mr. Sheils states, in pertinent part:

> Disclosure of foreign government information in violation of an understood or, as in this case, clearly stated expectation of confidentiality would cause foreign officials, not only of the government providing the information, but of other governments as well, to conclude that U.S. officials are unable and/or unwilling to preserve the confidentiality expected in exchanges between governments; thus foreign governments and their representatives would be less willing in the future to furnish information important to the conduct of U.S. foreign relations and other governmental functions, and *in general less disposed to cooperate in foreign relations matters of common interest.* Disclosure of the document at issue in the circumstances of this case would clearly result in damage to relations between the United States and the United Kingdom and, therefore, to the

---

**3.** *In camera* review may or may not be *ex parte. In camera* proceedings in FOIA cases involving classified documents are usually *ex parte* with even the counsel for the party seeking the docu-

ments denied the opportunity to be present. Hence courts' hesitancy to conduct *in camera* review in such cases. *See Pollard v. FBI,* 705 F.2d 1151, 1153 (9th Cir.1983).

national security in a clearly identifiable way.

. . . . .

The one document withheld in this case clearly concerns the foreign relations or activities of the United States inasmuch as it is a communication from a British Home Office official to an official of the U.S. Department of Justice concerning the extradition from the U.K. to the U.S. of two individuals, apparently British nationals, to stand trial in the United States in a highly publicized case. Disclosure of the document by the Government of the United States, particularly in light of the refusal of the British Government to agree to its release, would inevitably result in damage to relations between the U.K. and the U.S. The withheld document is a two-page letter dated July 28, 1994 from an official of the British Home Office to an official of the U.S. Department of Justice. Originally unclassified. Classified on October 27, 1995. Withheld in full. Exemption (b)(1). The letter comments on certain aspects of the extradition of two women, apparently British citizens, to face charges in the United States. The letter conveys certain concerns of the U.K. Government regarding the case which apparently was the subject of considerable attention in the British Parliament and otherwise in the U.K. with particular reference to the U.S.-U.K. extradition agreement.

The district court concluded that Mr. Sheils' statements were of a general and conclusory nature and that his declaration failed to provide a particularized explanation of how disclosure of the letter would damage the relations between the United States and the United Kingdom and therefore harm national security. We agree with the district court. Mr. Sheils merely confirms that the letter concerns extradition matters; he does not address how or why the letter's disclosure of extradition matters in particular will damage United States–United Kingdom relations. Mr. Sheils instead focuses on how disclosing a letter containing foreign government information will damage foreign relations, and, thus, national security, regardless of the letter's specific contents. We conclude

that Mr. Sheils' explanation lacks the particularity "to afford the requester an opportunity to intelligently advocate release of the withheld documents and to afford the court an opportunity to intelligently judge the contest." *Wiener*, 943 F.2d at 977.

Although Mr. Kennedy's declaration is slightly more informative than Mr. Sheils' declaration, he still fails to explain how disclosure of the material in the withheld letter will harm national security:

[i]t is a longstanding custom and accepted practice in international relations to treat as confidential and not subject to public disclosure information and documents exchanged between governments and their officials.... Diplomatic confidentiality obtains ... even with respect to information that may appear to be innocuous.

. . . . .

Disclosure by the U.S. of information furnished by another government in violation of the confidentiality normally accorded such information may also make other governments hesitant to cooperate in matters of interest to the U.S. This includes U.S. law enforcement interests such as those involved in the extradition case that is the subject of the document at issue in this litigation. Cooperation between the U.S. and the U.K. in international extradition of fugitives is a matter of substantial national interest to both governments. It can also be a matter of political sensitivity in the extraditing country, as has been the case with regard to fugitives extradited by the U.S. to the U.K. charged with crimes in Northern Ireland and extradition of the two women by the U.K. to the U.S. in the case discussed in the British document at issue here. Because of the sensitivity I cannot be more specific on the contents of the document and urge the court to conduct an *in camera* review.

Mr. Kennedy also points out that the British embassy stated that "U.K. authorities had already refused, 'on grounds of confidentiality,' to disclose the contents of the document." He concludes that:

In view of the expectation of the confidentiality of foreign government information

and the explicit confirmation of that expectation by the British Embassy letter ..., I have no doubt disclosure of the document by the U.S. government would harm the U.S. foreign relations and thereby damage national security.

Like Sheils, Kennedy focuses on how disclosure by the U.S. of foreign government information causes harm to U.S. foreign relations, and, thus, to national security even if the content "appear[s] to be innocuous." According to Kennedy, this harm occurs because all information exchanged between the U.S. and foreign governments is confidential. Mr. Kennedy also implies that disclosure would reduce international cooperation because of the sensitivity of the *category* of information within which this letter belongs, namely "international extradition of fugitives."

■ In this appeal, the government presses the argument that Sheils and Kennedy primarily rely on in their declarations, that even if the letter's contents are not injurious, damage resulting solely from disclosing foreign government information meets the standards of the Executive Order. However, it is clear that *all* information exchanged between foreign governments is not exempt from FOIA disclosure, not even *all* information that another government prefers to keep confidential-otherwise the inquiry would end after the first three conditions for classification are satisfied. Congress could have exempted all information exchanged between the U.S. and foreign governments from FOIA requests, but chose instead to defer to the Executive Branch. Likewise, the Executive Branch could have shielded all documents involving foreign governments from FOIA disclosure in EO 12958. Instead, when it enacted EO 12958 in 1995, it chose to make it easier for the public to view materials from foreign governments by eliminating the presumption of harm found in the prior Executive Order, EO 12356 § 1.3(c), and requiring the U.S. government to identify the particular damage that would result from releasing the information.

■ The government next argues that if all foreign government information is not shielded from FOIA disclosure, then all foreign government information relating to international extradition is protected by the exemption, because its sensitive nature makes its release inherently damaging to the national security. While we do not preclude the possibility that the government might be able in some circumstance to establish an inherently damaging category of information, we need not decide that question now, because the government did not meet its burden of establishing the justification for such a category in this case. Rather, it merely bandied about generalized fears of 'political sensitivity' relating to international extradition. In short, it failed to show that all documents falling within the category of international extraditions could reasonably be expected to result in damage to the national security if released. *Compare Armstrong v. Executive Office of the President,* 97 F.3d 575, 582 (D.C.Cir.1996) (invalidating categorical rule forbidding disclosure of the names of lower-level FBI agents in all activities and requiring more particularized showing of damage). Furthermore, the government's conduct-seeking agreement from the British Government to release the letter, rather than assuming that the letter must be confidential-raises serious questions regarding the existence of such a category of withholdable information. Similarly, the response of the British Government to the State Department's request for concurrence in the release of the letter shows that all international extradition information is *not* confidential-the British Embassy in Washington wrote the State Department that "[t]he Home Office have advised that the normal line in cases like this is that all correspondence between governments is confidential unless papers have been formally requisitioned by the defence." Weatherhead, Croft's defense lawyer, formally "requisitioned" the letter, in common parlance, by making a formal FOIA request, and thereby doing exactly what the British Government required in order to overcome its restrictions regarding disclosure. Moreover, the British Embassy's response raises further issues. Given that exceptions to the confidentiality of international extradition information do exist, it cannot be argued that the mere fact of disclosure of

*any* such information is harmful, but only that (1) a disclosure of any such information under circumstances that do not qualify as an exception would cause injury, or (2) the disclosure of specific information would be injurious in all circumstances. This, in turn, calls into question the appropriate scope and nature of such exceptions and whether categories subject to exceptions can ever qualify for blanket exemptions.

Because the government has failed to establish either that the broad category of all foreign government information or the narrower category of international extradition information is confidential, we must next look to the individual document itself. Neither the government's briefs nor the declarations submitted in support of withholding the letter sufficiently explain the harm to national security that could result from its disclosure.

 The government argues that its decision to classify the document should be given deference based on its affidavits and memoranda. Classification decisions are not given deference, however, until the government makes "an initial showing which would justify deference by the district court." *Rosenfeld v. United States Dept. of Justice,* 57 F.3d 803, 807 (9th Cir.1995). As we have explained above, the government made no such showing in the documents it initially presented to the district court. Accordingly, the district court correctly held that the government failed to prove the withheld letter was exempt from FOIA disclosure prior to conducting its *in camera ex parte* review of the document.

Deference was given, however, to the government's perspective of the document when the district court (and later this court) reviewed the letter *in camera.* We recognize that "[i]n certain FOIA cases ..., the government's public description of a document and the reasons for exemption may reveal the very information that the government claims is exempt from disclosure." *Doyle,* 722 F.2d at 556. Here, after it found the government failed to provide a sufficient basis for withholding the document in its briefs and declarations, the district court properly exercised its discretion to view the withheld letter *in camera.* After conducting *in cam-*era review of the letter, the district court stated that:

> it knew without hesitation or reservation that the letter could not be released. The court is unable to say why for the same reason defendants were unable to say why.... [T]here is no portion of it which could be disclosed without simultaneously disclosing injurious materials.

We disagree with the district court's conclusions. We have reviewed the letter *in camera,* and carefully considered its contents, including the "sensitivity, value, and utility" of the information contained therein. Having done so, we fail to comprehend how disclosing the letter at this time could cause "harm to the national defense or foreign relations of the United States." The letter is, to use Mr. Kennedy's term, "innocuous." Even after giving the act of classification the deference to which it is entitled, we are compelled to conclude that disclosure of the letter pursuant to Weatherhead's FOIA request could not reasonably "be expected to result in damage to the national security."

For the foregoing reasons, we reverse the district court's September 9, 1996 Order granting the government's motion for reconsideration and we reinstate its March 29, 1996 grant of summary judgment for Weatherhead.

REVERSED AND REMANDED.

SILVERMAN, Circuit Judge, Dissenting.

The uncontradicted evidence before the district court established that the Home Office letter was sent by the British government to the U.S. Justice Department with an expectation of confidentiality and that damage to American national security would result from breaching that expectation. Those facts were proved by the uncontroverted declarations of two State Department officials, Patrick F. Kennedy and Peter M. Sheils, both of which were furnished in connection with the motion for summary judgment. Plaintiff offered no evidence to the contrary.

The Kennedy declaration is the most significant. Kennedy, an assistant Secretary of State, attested that it is longstanding custom and accepted practice in international rela-

tions to extend "diplomatic confidentiality" to information exchanged between governments such as the information involved here. Kennedy stated that upon receipt of plaintiff's FOIA request, the American government consulted the British Embassy to seek its views on the possible disclosure of the letter. The British Embassy responded that its government did, indeed, expect the letter to remain confidential. In fact, the Embassy stated that British authorities, on confidentiality grounds, previously refused a separate request for release of the letter made directly to the British government. Thus, Kennedy's declaration not only was uncontroverted; it was corroborated.

Kennedy's declaration also stated that disclosure of the information in violation of accepted diplomatic confidentiality reasonably could be expected to damage relations between the U.S. and Britain, and between the U.S. and other governments, and he explained how: If the letter is released, Britain and other countries could well conclude that the U.S. cannot be trusted to protect confidential information. He stated that if diplomatic confidentiality is violated, it is likely that other nations will be less inclined to provide sensitive information or to cooperate in the international extradition of fugitives and in other matters of substantial interest to the United States. Kennedy attested that extraditions can be the subject of political sensitivity in the extraditing country. Such, he stated, was the case involving the two British women whose extraditions were the subject of the very document in question. Kennedy stated that he had "no doubt" but that disclosure of the letter would damage our foreign relations and national security.

Plaintiff offered no evidence to rebut any of this. He did not produce an affidavit from a diplomat, political scientist, academic, student of foreign relations, lawyer, journalist-anyone-to refute Kennedy's declaration. Nor am I aware of any other reason to treat Kennedy's sobering assessment with so little regard. The proper inquiry is not whether Kennedy's declaration could have contained more, but only whether it contained enough. In my view, it did.

Having examined the letter *in camera* and having considered its contents "including the 'sensitivity, value, and utility' of the information contained therein," the majority says that it "fail[s] to comprehend how disclosing the letter at this time could cause harm to the national defense or foreign relations of the United States." The district judge, on the other hand, "knew without hesitation or reservation that the letter could not be released" when he saw it *in camera.* Either way, we judges are outside of our area of expertise here. It's one thing to examine a document *in camera* for the existence of facts—to see, for example, whether it deals with attorney-client communications or other privileged matter. See *Maricopa Audubon Soc'y v. U.S. Forest Serv.,* 108 F.3d 1089 (9th Cir.1997). It's a whole different kettle of fish to do what the majority has presumed to do here, to make its own evaluation of both the sensitivity of a classified document and the damage to national security that might be caused by disclosure. With all due respect, I suggest that in matters of national defense and foreign policy, the court should be very leery of substituting its own geopolitical judgment for that of career diplomats whose assessments have not been refuted in any way.

There is no basis in the record to conclude otherwise than that the letter is "foreign government information" as defined by Section 1.1(d) of the Executive Order, that its release would cause damage to the national security in the manner described by Kennedy, and that therefore it is exempt from disclosure. I would affirm the district court's grant of summary judgment for the government and therefore, I respectfully dissent.