# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued January 10, 2013          Decided May 21, 2013

No. 12-5137

JUDICIAL WATCH, INC.,
APPELLANT

v.

UNITED STATES DEPARTMENT OF DEFENSE AND CENTRAL
INTELLIGENCE AGENCY,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:11-cv-00890)

*Michael Bekesha* argued the cause and filed the briefs for appellant. *Paul J. Orfanedes* and *James F. Peterson* entered appearances.

*Robert M. Loeb*, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief were *Stuart Delery*, Principal Deputy Assistant Attorney General, *Ronald C. Machen Jr.*, U.S. Attorney, and *Matthew Collette*, Attorney.

Before: GARLAND, *Chief Judge*, ROGERS, *Circuit Judge*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed PER CURIAM.

PER CURIAM:    Judicial Watch filed a Freedom of Information Act request seeking disclosure by the Central Intelligence Agency of 52 post-mortem images of Osama bin Laden.  The agency refused on the ground that the images were classified Top Secret.  Judicial Watch sued, and the district court granted summary judgment for the agency.  We affirm because the images were properly classified and hence are exempt from disclosure under the Act.

I

On May 1, 2011, President Obama announced that American personnel had killed al Qaeda leader Osama bin Laden in Abbottabad, Pakistan and buried his body at sea. Shortly thereafter, Judicial Watch filed Freedom of Information Act (FOIA) requests with the Department of Defense and the Central Intelligence Agency (CIA) seeking any photographs or videos depicting bin Laden "during and/or after the U.S. military operation in Pakistan."  The Defense Department responded that it had no such images.  The CIA acknowledged that it had 52 responsive records, but said that it intended to withhold them because they were classified Top Secret.[1]  Judicial Watch sued, and the parties filed cross-motions for summary judgment.

---

[1]After oral argument on this appeal, the CIA acknowledged that it had located seven additional responsive records, which it withheld on the same basis as the original 52 images.  *See* Rule 28(j) Letter from CIA Counsel (filed Feb. 15, 2013).

The Government supported its motion with three declarations that are relevant on appeal.[2] The first, a lengthy declaration by John Bennett, Director of the CIA's National Clandestine Service, stated that all 52 responsive records contained "post-mortem images of [bin Laden's] body." Bennett Decl. ¶ 11. Many, he said, were "quite graphic" and "gruesome" pictures displaying the bullet wound that killed bin Laden; some showed bin Laden's face in a way intended to enable facial recognition analysis; and some documented the transportation and burial of bin Laden's corpse. *Id.* Bennett attested that he had personally reviewed each image and concluded that all of them were properly classified Top Secret because, if disclosed, they could be expected to lead to retaliatory attacks against Americans and aid the production of anti-American propaganda. *Id.* ¶¶ 4, 12, 23. Bennett analogized the bin Laden images to post-mortem photographs of al Qaeda leader Abu Musab al-Zarqawi, which had been portrayed in Pakistan as an "ad for jihad," *id.* ¶ 26, and to images of abuse at Abu Ghraib prison, which had been used "very effective[ly]" by al Qaeda to recruit supporters and raise funds, *id.* ¶ 24. He said that al Qaeda had already produced propaganda relating to bin Laden's death, and that its new leader had questioned whether bin Laden had in fact received a proper burial at sea. *Id.* ¶ 25. Bennett also noted that a subset of the records, including those used to conduct facial recognition analysis, could enable foreign intelligence services to infer certain CIA intelligence techniques. *Id.* ¶ 29.

Lieutenant General Robert Neller, the Director of Operations, J-3, on the Joint Staff at the Pentagon, affirmed that

---

[2] A fourth declaration, filed by William Kammer, Chief of the Department of Defense's Freedom of Information Division, attested that the Pentagon possessed no responsive records. Judicial Watch no longer contests this point.

he, too, had personally reviewed the images. *See* Neller Decl. ¶ 2. Like Bennett, Neller believed that their release would "pose a clear and grave risk of inciting violence and riots against U.S. and Coalition forces," and "expose innocent Afghan and American civilians to harm." *Id.* ¶ 6. Neller cited the fatal riots that had followed both the publication of a Danish cartoon of the Prophet Muhammad and an erroneous report that American soldiers had desecrated the Koran. *Id.* ¶¶ 7-8. Neller believed that a similar violent reaction could be expected to follow the release of the bin Laden images. *Id.* ¶ 9.

Admiral William McRaven, Commander of the United States Special Operations Command, submitted a third, partially classified declaration.[3] In the non-classified portions of the declaration, McRaven attested, again on the basis of first-hand review, that disclosure of some of the images would enable identification of the special operations unit that participated in the Abbottabad operation, thereby exposing its members and their families to great risk of harm. McRaven Decl. ¶ 5. He explained that other images would reveal classified methods and tactics used in U.S. special operations. *Id.* ¶ 6. As a result, he believed release "could reasonably be expected to cause harm to the national security." *Id.* ¶ 8.

In its cross-motion for summary judgment, Judicial Watch argued that the CIA's declarations failed to demonstrate either substantive or procedural compliance with the criteria for classification. With respect to the latter, Judicial Watch argued that the declarations failed to identify the "original classification authority" who had classified the records, or to attest that the records had been properly marked. The CIA responded by filing

---

[3]The CIA filed an unredacted version of the McRaven declaration *ex parte*. We do not rely on the classified portions of the declaration in this opinion.

a fourth declaration, written by Elizabeth Culver, the Information Review Officer for the CIA's National Clandestine Service. Culver explained that the images had initially been "derivatively classified" by a CIA official in accordance with the criteria set out in a classification guide written by the CIA's Director of Information Management. Culver Decl. ¶ 8. At the time Director Bennett had filed his declaration, the records each contained the marking "Top Secret." *Id.* ¶ 7. Since then, "out of an abundance of caution," other markings had been added to the records, including the identity of the derivative classifier, citations to the classification guide and the reasons for classification, and the applicable declassification instructions. *Id.* Culver said she had confirmed, after personally reviewing the records, that each now contained all the required classification markings. *Id.*

On the basis of these declarations, the district court concluded that the CIA had sustained its burden of showing that the images of bin Laden satisfied the substantive and procedural criteria for classification. *See Judicial Watch, Inc. v. U.S. Dep't of Def.*, 857 F. Supp. 2d 44, 52 (D.D.C. 2012). The CIA's declarations, the court said, gave a "plausible" and "logical" account of the harm to national security that might result from the release of these images. *Id.* at 63. While the record left uncertain whether the images had been classified according to proper procedures at the time Judicial Watch made its FOIA request, the court said the declarations submitted by Bennett and Culver demonstrated that the agency had since remedied whatever procedural defects might have existed. *Id.* at 57-58. Accordingly, the court held that the CIA had properly withheld

these records under FOIA Exemption 1.[4] *Id.* at 63-64. Judicial Watch appealed.

## II

FOIA requires agencies to disclose records on request unless one of nine exemptions applies. *See Milner v. Dep't of the Navy*, 131 S. Ct. 1259, 1262 (2011). Exemption 1, which the CIA invokes in this case, permits agencies to withhold records that are "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1). Agencies may establish the applicability of Exemption 1 by affidavit (or declaration). *See ACLU v. U.S. Dep't of Def.*, 628 F.3d 612, 619 (D.C. Cir. 2011). We accord such an affidavit "substantial weight": so long as it "describes the justifications for withholding the information with specific detail, demonstrates that the information withheld logically falls within the claimed exemption, and is not contradicted by contrary evidence in the record or by evidence of the agency's bad faith, . . . summary judgment is warranted on the basis of the affidavit alone." *Id*. (internal quotation marks omitted); *see Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009); *Wolf v. CIA*, 473 F.3d 370, 374-75 (D.C. Cir. 2007); *Miller v. Casey*, 730 F.2d 773, 776 (D.C. Cir. 1984). "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *ACLU*, 628 F.3d at 619 (quoting *Larson*, 565 F.3d at 862 (quoting *Wolf*, 473 F.3d at 374–75)).

---

[4]The district court did not address the agency's alternative argument that some of the images could be withheld under FOIA Exemption 3. *See Judicial Watch*, 857 F. Supp. 2d at 55; 5 U.S.C. § 552(b)(3). We also do not reach that question.

Executive Order No. 13,526, 75 Fed. Reg. 707 (Dec. 29, 2009), the operative classification order under Exemption 1, sets forth both substantive and procedural criteria for classification. *See, e.g.*, *Lesar v. U.S. Dep't of Justice*, 636 F.2d 472, 481 (D.C. Cir. 1980) (explaining that the Executive Order's substantive and procedural criteria must be satisfied for an agency to properly invoke Exemption 1); H.R. REP. NO. 93-1380, at 228-29 (1974) (same). The Order's substantive criteria, as relevant here, are twofold. First, classified information must pertain to at least one of eight subject-matter classification categories. *See* Exec. Order No. 13,526, §§ 1.1(a)(3), 1.4. Second, disclosure of that information must reasonably be expected to cause some degree of harm to national security -- in the case of Top Secret information, "exceptionally grave" harm -- that is identifiable or describable. *See id.* §§ 1.1(a)(4), 1.2(a)(1), 1.4. The Order also establishes two pertinent procedural requirements. Information may be classified only by an individual with original or derivative classification authority. *See id.* §§ 1.1(a)(1), 2.1. And classified documents must be marked with several pieces of information, including the identity of the classifier and instructions for declassification. *See id.* §§ 1.6, 2.1(b).

Judicial Watch raises both substantive and procedural challenges to the CIA's classification decision. We consider each in turn.

A

Turning first to the substantive question, it is indisputable that the images at issue fall within the Executive Order's subject-matter limits. At least some of the images "pertain[] to . . . intelligence activities (including covert action), [or] intelligence sources or methods," Exec. Order No. 13,526, § 1.4(c), and all 52 images plainly "pertain[] to . . . foreign activities of the United States," *id.* § 1.4(d). As the district court

observed, "pertains" is "not a very demanding verb." *Judicial Watch*, 857 F. Supp. 2d at 60. And every image at issue documents events involving American military personnel thousands of miles outside of American territory.

There is also no doubt that the declarations of Director Bennett and Admiral McRaven establish the requisite level of harm -- the second substantive limit on classification -- for a great many of the images. The photographs used to conduct facial recognition analysis could reasonably be expected to reveal classified intelligence methods. *See* Bennett Decl. ¶ 29; Judicial Watch Br. 12-13 (conceding the point). The images displaying members of the special operations unit that conducted the raid could reasonably be expected to endanger those personnel. *See* McRaven Decl. ¶¶ 3, 5. These are valid grounds for classification under our precedents. *See, e.g.*, *Miller*, 730 F.2d at 775-77; *Halperin v. CIA*, 629 F.2d 144, 148-50 (D.C. Cir. 1980). Furthermore, Judicial Watch does not appear to seriously question the CIA's contention that the most "graphic" and "gruesome" of the remaining images -- those displaying the bullet wound to bin Laden's head -- merit classification because of the danger that their release would lead to violence against American interests. *See* Judicial Watch Reply Br. 2, 8-9. In any event, the rationale for withholding less graphic and gruesome images of bin Laden (discussed below) would apply *a fortiori* to these images.

Judicial Watch correctly focuses instead on the most seemingly innocuous of the images: those that depict "the preparation of [bin Laden's] body for burial" and "the burial itself," Bennett Decl. ¶ 11. *See* Judicial Watch Reply Br. 1. Judicial Watch contends it is unlikely that the disclosure of those images would cause any damage, let alone exceptionally grave damage, to U.S. national security. It argues that al Qaeda and its affiliates "do not need a specific reason to incite violence," and

that any claim that individuals would engage in violence upon seeing such images is mere speculation. Judicial Watch Br. 23-24.

As the district court rightly concluded, however, the CIA's declarations give reason to believe that releasing images of American military personnel burying the founder and leader of al Qaeda could cause exceptionally grave harm. *See Judicial Watch*, 857 F. Supp. 2d at 62. General Neller's declaration describes prior instances in which reasonably analogous disclosures have led to widespread and fatal violence in the Middle East, some of it directed at U.S. interests. The publication of a Danish cartoon of the Prophet Muhammad led to hundreds of injuries and deaths, as well as to an attack on a U.S. airbase in Afghanistan. *See* Neller Decl. ¶ 8. Likewise, an erroneous article in *Newsweek*, alleging that American soldiers had desecrated the Koran, led to eleven deaths and many injuries during protests against the United States in Afghanistan and Egypt. *Id.* ¶ 7. Director Bennett's declaration gives plausible reason to believe that a comparable reaction would follow the release of post-mortem images of bin Laden, "including images of his burial." Bennett Decl. ¶ 27. Bennett explains that al Qaeda has already devoted attention to the "so-called 'martyrdom'" of bin Laden and has specifically "attacked the United States' assertions that [he] received an appropriate Islamic burial at sea." *Id.* ¶ 25. Bennett also notes that releasing the images of the burial at sea "could be interpreted as a deliberate attempt by the United States to humiliate" bin Laden. *Id.* ¶ 27. Together, these declarations support their declarants' determinations that releasing any of the images, including the burial images, could reasonably be expected to trigger violence and attacks "against United States interests, personnel, and

citizens worldwide."  Neller Decl. ¶ 9; *see id.* ¶ 6; Bennett Decl. ¶¶ 25, 27.[5]

Judicial Watch protests that the government's declarations show nothing more than that release of the images may cause "some individuals who do not like the United States" to commit violence overseas, and that the courts should not succumb to this kind of blackmail.  Judicial Watch Br. 21-22.  First, it is important to remember that this case does not involve a First Amendment challenge to an effort by the government to suppress images in the hands of private parties, a challenge that would come out quite differently.  *Cf. Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 134-35 (1992) ("Speech cannot be . . . banned, simply because it might offend a hostile mob.").  Rather, it is a statutory challenge, in which the sole question is whether the CIA has properly invoked FOIA Exemption 1 to authorize withholding images in its own possession.  *Cf. Afshar v. Dep't of State*, 702 F.2d 1125, 1131 (D.C. Cir. 1983) (permitting the withholding of documents under FOIA where release "may force a [foreign] government to retaliate").  Second, this is not a case in which the declarants are making predictions about the consequences of releasing just any images.  Rather, they are predicting the consequences of releasing an extraordinary set of images, ones that depict American military personnel burying the founder and leader of

---

[5]For the same reasons, these declarations support the agency's determination that releasing the images of bin Laden would cause harm notwithstanding its prior "written descriptions of the event," Judicial Watch Reply Br. 10.  *See ACLU*, 628 F.3d at 625 ("[W]e have repeatedly rejected the argument that the government's decision to disclose some information prevents the government from withholding other information about the same subject."); *Wolf*, 473 F.3d at 378 (permitting withholding notwithstanding "the fact that information exists in some form in the public domain").

al Qaeda. Third, the declarants support those predictions not with generalized claims, but with specific, reasonably analogous examples. Finally, it is undisputed that the government is withholding the images not to shield wrongdoing or avoid embarrassment, *see* Exec. Order No. 13,526, § 1.7(a), but rather to prevent the killing of Americans and violence against American interests. Indeed, because the CIA's predictions of the violence that could accompany disclosure of the images provide an adequate basis for classification, we do not rely upon or reach the agency's alternative argument that the images may be classified on the ground that their disclosure would facilitate anti-American propaganda. *See ACLU*, 628 F.3d at 624 (declining to decide whether classification on that ground is proper).

As we have said before, "any affidavit or other agency statement of threatened harm to national security will always be speculative to some extent." *Id.* at 619 (citation omitted). Our role is to ensure that those predictions are "'logical' or 'plausible.'" *Id.* (quoting *Larson*, 565 F.3d at 862). We agree with the district court that the CIA's declarations in this case cross that threshold. *See Judicial Watch*, 857 F. Supp. 2d at 62.

B

An agency may withhold records under Exemption 1 only if they are "classified in accordance with the procedural criteria of the governing Executive Order as well as its substantive terms." *See Lesar*, 636 F.2d at 483. On appeal, Judicial Watch argues that the CIA failed to follow proper procedures in two respects.

First, Judicial Watch argues that the images at issue were not classified until after the CIA received its FOIA request, thereby triggering special procedural requirements that Judicial

Watch alleges were not followed. *See* Exec. Order No. 13,526, § 1.7(d) (providing that previously undisclosed information may be classified after an agency has received a FOIA request "only if such classification . . . is accomplished on a document-by-document basis with the personal participation or under the direction of the agency head, deputy agency head, or the senior agency official designated under [a section of] this order"). But Judicial Watch's factual premise is mistaken, as the CIA has averred that the images were in fact classified before it received the appellant's FOIA request, *see* Culver Decl. ¶ 7 n.1; CIA Br. 52; Oral Arg. Recording at 28:50-29:20, and there is no evidence to the contrary.

Second, Judicial Watch argues that the images do not contain all of the proper classification markings because they fail to name the person with "original classification authority" who first classified them. *See* Exec. Order No. 13,526, § 1.6(a)(2). The Culver declaration, which the agency clarified at oral argument, explains the CIA's position: the records were not initially classified by someone with original classification authority, but rather by an individual who "derivatively" classified the records by "apply[ing] classification markings . . . as directed by a classification guide." Culver Decl. ¶ 8; Exec. Order No. 13,526, § 2.1(a); *see* Oral Arg. Recording at 21:30-23:10. Accordingly, the CIA says, the only original classification authority identified on the records was the classification guide itself. *See* Culver Decl. ¶¶ 7-8; Oral Arg. Recording at 23:05-08.

Although this explanation may account for why the CIA did not mark the documents with the name of a person possessing original classification authority, it raises a separate problem. Even if the CIA is right that documents can be derivatively classified and marked in this way -- and we express no view on the matter -- we cannot determine whether derivative

classification of the images was proper without some description of the classification guide on which the derivative classifier purportedly relied. Yet in this case, the CIA has provided no description of the guide's provisions, not even a general description, that would permit us to determine whether the derivative classification was properly based on the guide. *Cf. Wilson v. McConnell*, 501 F. Supp. 2d 545, 553 (S.D.N.Y. 2007) (concluding that the derivative classification of a document was proper by examining specific provisions of a CIA classification guide that the agency had provided to the court). Hence, we cannot determine whether the derivative classifier misapplied the guide, or whether the guide's instructions were so vague as to operate as no constraint at all.

In some cases, an agency's silence on such a matter would merit a remand requiring an agency official to review the documents and file an additional affidavit, or, in rare cases, requiring the district court to review the documents *in camera*. *Cf. Allen v. CIA*, 636 F.2d 1287, 1292 (D.C. Cir. 1980); *Lesar*, 636 F.2d at 485; *Halperin v. Dep't of State*, 565 F.2d 699, 707 (D.C. Cir. 1977). In this case, however, we already have a declaration from Director Bennett, who has original classification authority, *see* Bennett Decl. ¶ 18, averring that he reviewed the images and determined that they were correctly classified Top Secret, *id.* ¶ 27. Accordingly, because the "affidavits clearly indicate that the documents fit within the substantive standards of [the] Executive Order," and because the Bennett declaration removes any doubt that a person with original classification authority has approved the classification decision, any failure relating to application of the classification guide would not "reflect adversely on the agency's overall classification decision." *Lesar*, 636 F.2d at 484, 485. Therefore, no further steps are required for us to determine that withholding the images was warranted. *See id*.

14

III

For the foregoing reasons, the judgment of the district court is

*Affirmed.*