13-3684-cv
*Center for Constitutional Rights v. Central Intelligence Agency*

In the

# United States Court of Appeals

## For the Second Circuit

————

AUGUST TERM 2013
No. 13-3684-cv

CENTER FOR CONSTITUTIONAL RIGHTS,
*Plaintiff-Appellant,*

*v.*

CENTRAL INTELLIGENCE AGENCY, DEPARTMENT OF DEFENSE,
DEPARTMENT OF JUSTICE, FEDERAL BUREAU OF INVESTIGATION,
DEFENSE INTELLIGENCE AGENCY, UNITED STATES SOUTHERN
COMMAND,
*Defendants-Appellees.*[*]

————

Appeal from the United States District Court
for the Southern District of New York.
No. 12 Civ. 135 (NRB) — Naomi Reice Buchwald, *Judge.*

————

ARGUED: JUNE 25, 2014
DECIDED: SEPTEMBER 2, 2014

————

---

[*] The Clerk of Court is directed to amend the official caption in this case to conform to the listing of the parties above.

Before: CABRANES, CARNEY, and DRONEY, *Circuit Judges*.

————

Appellant Center for Constitutional Rights seeks disclosure by the government, pursuant to the Freedom of Information Act ("FOIA"), of certain videos and photographs of a high-profile Guantanamo Bay detainee, Mohammed al-Qahtani, who is believed to be the so-called "20th hijacker" in the September 11, 2001 terrorist attacks on the United States.

We agree with the United States District Court for the Southern District of New York (Naomi Reice Buchwald, *Judge*) that the government has met its burden of establishing that these images are exempt from disclosure pursuant to FOIA Exemption 1, which authorizes non-disclosure of records that are properly authorized by Executive order to be kept secret in the interest of "national defense or foreign policy." 5 U.S.C. § 552(b)(1). The declarations submitted by the government establish with adequate specificity that government release of images depicting al-Qahtani—one of the most high-profile Guantanamo Bay detainees, whose treatment at Guantanamo has been widely publicized—could logically and plausibly harm national security because these images are uniquely susceptible to use by anti-American extremists as propaganda to incite violence against United States interests domestically and abroad.

Accordingly, we **AFFIRM** the September 12, 2013 judgment of the District Court.

—————

LAWRENCE S. LUSTBERG (Joseph A. Pace, *on the brief*), Gibbons P.C., Newark, NJ, *for Plaintiff-Appellant Center for Constitutional Rights*,

TARA M. LA MORTE (Emily E. Daughtry, Benjamin H. Torrance, *on the brief*), Assistant United States Attorneys, *for* Preet Bharara, United States Attorney for the Southern District of New York, New York, NY, *for Defendants-Appellees Central Intelligence Agency et al.*

—————

JOSÉ A. CABRANES, *Circuit Judge*:

Appellant Center for Constitutional Rights ("CCR") seeks disclosure, pursuant to the Freedom of Information Act ("FOIA"), principally by the Department of Defense ("DoD") and the Federal Bureau of Investigation ("FBI" and, jointly with the DoD, the "government") of certain videos and photographs of a high-profile Guantanamo Bay detainee, Mohammed al-Qahtani, who is believed to be the so-called "20th hijacker" in the September 11, 2001 terrorist attacks on the United States.

We hold that the government has met its burden of establishing that these images are exempt from disclosure pursuant to FOIA Exemption 1, which authorizes non-disclosure of records that are properly authorized by Executive order to be kept secret in the interest of "national defense or foreign policy." 5 U.S.C. § 552(b)(1). The declarations submitted by the government establish

with adequate specificity that release of images depicting al-Qahtani—one of the most high-profile Guantanamo Bay detainees, whose treatment at Guantanamo has been widely publicized—could logically and plausibly harm national security because these images are uniquely susceptible to use by anti-American extremists as propaganda to incite violence against United States interests domestically and abroad.

Accordingly, we affirm the September 12, 2013 judgment of the United States District Court for the Southern District of New York (Naomi Reice Buchwald, *Judge*) granting summary judgment in favor of defendants.

## BACKGROUND

### A. Mohammed al-Qahtani's Detention

Mohammed al-Qahtani,[1] a Saudi national, has been held at Guantanamo Bay from February 13, 2002 to the present day on suspicion that he had planned to act as the 20th hijacker of the planes used in the September 11, 2001 ("9/11") terrorist attacks on the United States, but was prevented from entering the United States in August 2001. Al-Qahtani's detention first drew public attention in 2005 when a log of his interrogations was purloined and published in Time Magazine. The government subsequently made official disclosures regarding: (1) the dates and conditions of al-Qahtani's

---

[1] In certain government press releases, al-Qahtani's name has been spelled "Mohamed al Kahtani." *See, e.g.*, Joint App'x ("J.A.") 309.

detention; (2) the involvement of the DoD and FBI in his interrogation; (3) the interrogation tactics used; (4) al-Qahtani's mental, physical, and psychological response to the interrogation; and (5) al-Qahtani's eventual cooperation.[2] In a January 2009 interview published in the Washington Post, the DoD's Convening Authority for Military Commissions,[3] Susan J. Crawford, stated that al-Qahtani's treatment at Guantanamo, in her opinion, "met the legal definition of torture." *See* Bob Woodward, *Detainee Tortured, Says U.S. Official*, WASHINGTON POST, A1, Jan. 14, 2009.

## B. The FOIA Requests and Responses

On March 4, 2010, CCR filed FOIA requests with the government seeking disclosure of videos, photographs, and other audio-visual recordings of al-Qahtani at Guantanamo between 2002 and 2005. On January 9, 2012, after the government did not respond

---

[2] In response to the unauthorized disclosure of the classified interrogation log, the DoD issued a press release on June 12, 2005 stating that al-Qahtani admitted to, *inter alia*, having been sent to the United States by Khalid Sheik Mohammed, the architect of 9/11; having met Osama Bin Laden on several occasions; and having received "terrorist training" at two al Qaeda camps and been in contact with senior al Qaeda leaders. J.A. 309-10. According to the government, al-Qahtani also provided "valuable intelligence information" regarding the planning of the 9/11 attacks and how Osama Bin Laden evaded capture. J.A. 310.

[3] Under the Military Commissions Act of 2006, a military commission "may be convened by the Secretary of Defense or by any officer or official of the United States designated by the Secretary for that purpose." 10 U.S.C. § 948h. The Convening Authority is an individual "empowered [by the Secretary of Defense] to convene military commissions [and] refer charges to trial." *See Organization Overview*, OFFICE OF MILITARY COMMISSIONS ORGANIZATION OVERVIEW, http://www.mc. mil/ABOUTUS/OrganizationOverview.aspx (last visited July 10, 2014).

to the requests, CCR filed this lawsuit, purportedly with al-Qahtani's consent.[4]

In response, DoD and FBI identified 62 records responsive to CCR's requests (the "Responsive Records")[5]: 53 FBI videotapes depicting al-Qahtani's activities in his cell and his interactions with DoD personnel (the "FBI videos"); one video showing two "forced cell extractions" of al-Qahtani (the "FCE video"); two videos showing "document intelligence debriefings" (the "Debriefing videos"); and six "mug-shots" of al-Qahtani. They claimed the right to withhold the Responsive Records primarily under FOIA Exemption 1, which exempts from disclosure records that are "specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign

---

[4] Sandra L. Babcock represents CCR in this action, and also represents al-Qahtani in a habeas proceeding pending in the District Court for the District of Columbia. She submitted a declaration in this action, dated October 2, 2012, attesting that she had discussed the FOIA action with al-Qahtani after its filing and that he "expressed to his attorneys that he wishes to have all videotapes, photos, and other recordings of him released." J.A. 38.  However, in April 2012, the habeas action was stayed on the basis of al-Qahtani's "current[] incompeten[ce] and [inability] to assist effectively in [his] case." *See* Minute Order, *al-Qahtani v. Obama*, No. 05 Civ. 1971 (D.D.C. Apr. 20, 2012).

[5] The CIA submitted a so-called "*Glomar* response," which is a response that neither confirms nor denies the existence of documents responsive to the request, and is permissible "where to answer the FOIA inquiry [by confirming or denying the existence of responsive documents] would cause harm cognizable under a[ ] FOIA exception." *Wilner v. Nat'l Sec. Agency*, 592 F.3d 60, 68 (2d Cir. 2009) (second alteration in original; internal quotation marks omitted). The CIA's *Glomar* response was challenged in the District Court, but is not challenged on appeal.

policy," and "are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1).[6]

The government sought to justify the invocation of Exemption 1 in three public declarations and in one classified declaration.[7] Each declaration represented that the Responsive Records were properly classified under Executive Order 13,526, which pertains, in relevant part, to: (1) "military plans . . . or operations"; (2) "intelligence activities (including covert action), intelligence sources or methods, or cryptology"; and (3) "foreign relations or foreign activities of the

---

[6] The government also argued that some or all of the records were exempt under FOIA Exemptions 3, 5 U.S.C. § 552(b)(3) (documents specifically exempted from disclosure by statute); 6, *id.* § 552(b)(6) (privacy interests in records held by the government); 7(A), *id.* § 552(b)(7)(A) (law enforcement records that would reasonably be expected to interfere with enforcement proceedings); 7(C), *id.* § 552(b)(7)(C) (privacy interests in law enforcement records); and Section (j)(2) of the Privacy Act, *id.* § 552a(j)(2). Because we resolve the case under Exemption 1, we do not address these additional exemptions.

[7] The Declaration of Major General Karl R. Horst is described below. The other two public declarants were Rear Admiral David B. Woods and Deputy Assistant Secretary of Defense William K. Lietzau. Admiral Woods represented that disclosure of the Responsive Records could damage national security by "chilling" intelligence collection efforts at Guantanamo and elsewhere, by "mak[ing] it substantially less likely that the detainee will cooperate and provide information in the future." J.A. 1284-85. Mr. Lietzau represented that the Responsive Records could reasonably be expected to damage national security by "providing a means for detainees to communicate [through coded messages] outside of approved channels, including with enemy forces" and by "damaging U.S. foreign relations by causing international partners to question the U.S. commitment to its longstanding policy and practice of shielding detainees from public curiosity, consistent with the Geneva Conventions." J.A. 1307. Because we do not rely on these justifications, we need not elaborate upon the content of the declarations.

United States, including confidential sources."   Exec. Order No. 13,526 § 1.4(a), (c), (d), 75 Fed. Reg. 707, 707 (Dec. 29, 2009).

Declarant Major General Karl R. Horst[8] asserted that the disclosure of the Responsive Records could reasonably be expected to harm national security by "endangering the lives and physical safety" of U.S. military personnel, diplomats, and aid workers serving in Afghanistan and elsewhere, and by "aiding in the recruitment and financing of extremist and insurgent groups" because "enemy forces in Afghanistan" and elsewhere "have previously used videos and photographs [particularly of U.S. forces interacting with detainees] out of context to incite the civilian population and influence government officials." J.A. 1299-1300. As examples of images that had been used by extremist groups to recruit new members and incite violence, General Horst cited images published by the media in 2004 relating to allegations of abuse of Iraqi detainees in Iraq and media reporting in 2005 of alleged incidents of mishandling of the Koran at Guantanamo. *Id.* In addition, General Horst stated that "[t]he subject of U.S. detainee operations in Iraq, Afghanistan, and at [Guantanamo] is extremely sensitive with the host nations and governments whose nationals we detain." J.A. 1301. He opined that "release of any portion of the

_____

[8] At the relevant time, General Horst was Chief of Staff of the United States Central Command of the DoD.  In that capacity, he was responsible for the Headquarters of the Combatant Command, which consists of 2,000 military personnel responsible for providing staff oversight of over 200,000 military personnel deployed in over twenty countries in the Middle East and Central Asia, including Iraq, Afghanistan, and Pakistan. J.A. 1295-96.

[Responsive Records] would facilitate the enemy's ability to conduct information operations and could be used to increase anti-American sentiment," particularly because the images could be manipulated to show greater mistreatment than actually occurred, or change the chronology of actual events. J.A. 1301-02.

The government submitted *ex parte* an index ("the FBI Index") identifying the contents of the 53 FBI videotapes for the District Court's *in camera* review. *See* J.A. 1338-39.[9]

## C.    The District Court's Decision

In a September 12, 2013 memorandum and order, the District Court granted summary judgment for the government, approving nondisclosure of the Responsive Records under Exemption 1, on the basis that it was "both logical and plausible that the disclosure of any portion of the [Responsive Records] could reasonably be expected to harm national security." *Ctr. for Constitutional Rights v. Dep't of Def.*, 968 F. Supp. 2d 623, 635-36 (S.D.N.Y. 2013). In particular, after reviewing *in camera* the FBI Index describing the

---

[9] Plaintiffs did not challenge the adequacy of the government's review in the District Court or on appeal. Nor have they challenged the scope of the District Court's review of the withheld documents, which entailed an *in camera* review of the index submitted *ex parte* and under seal by the government. *Cf. Wilner v. Nat'l Sec. Agency*, 592 F.3d 60, 75-76 (2d Cir. 2009) ("A court should only consider information *ex parte* and *in camera* that the agency is unable to make public if questions remain after the relevant issues have been identified by the agency's public affidavits and have been tested by plaintiffs.").

videotapes, the District Court found it "logical and plausible that extremists would utilize images of al-Qahtani (whether in native or manipulated formats) to incite anti-American sentiment, to raise funds, and/or to recruit other loyalists, as has occurred in the past." *Id.* at 636. The District Court found further that such misuse was "particularly plausible in this case, which involves a high-profile detainee, the treatment of whom the Convening Authority for Military Commissions . . . determined 'met the legal definition of torture.'" *Id.* The Court then rejected CCR's argument that the extensive prior disclosures concerning al-Qahtani undermined the government's justifications. *Id.*

This timely appeal followed.

## DISCUSSION

Exceptions to FOIA's general principle of "broad disclosure of Government records . . . have consistently been given a narrow compass." *New York Times Co. v. U.S. Dep't of Justice*, --- F.3d ----, No. 13-422 L, 2014 WL 2838861, at *8 (2d Cir. June 23, 2014) (citation and internal quotation marks omitted). The government bears the burden of demonstrating that an exemption applies to each item of information it seeks to withhold, *Nat'l Council of La Raza v. Dep't of Justice*, 411 F.3d 350, 356 (2d Cir. 2005), and "all doubts as to the applicability of the exemption must be resolved in favor of disclosure," *New York Times Co.*, 2014 WL 2838861, at *8 (internal quotation marks omitted).

We review a district court's order granting summary judgment in a FOIA action *de novo*. *Id.* An agency may carry its burden by submitting declarations "giving reasonably detailed explanations why any withheld documents fall within an exemption," and such declarations "are accorded a presumption of good faith." *Wilner v. Nat'l Sec. Agency*, 592 F.3d 60, 69 (2d Cir. 2009) (internal quotation marks omitted). When such declarations are "not controverted by either contrary evidence in the record nor by evidence of agency bad faith," summary judgment for the government is warranted. *Id.* at 73 (internal quotation marks omitted). Notwithstanding the presumption in favor of disclosure, when the claimed exemption implicates national security, "an agency's justification for invoking a FOIA exemption is sufficient if it appears logical or plausible." *Id.* (internal quotation marks omitted).

At issue here is whether FOIA Exemption 1 is satisfied. This exemption shields from disclosure records that are "specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy," and "are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1). The parties dispute whether the Responsive Records satisfied the prerequisites for classification under Executive Order 13,526—specifically, whether the "unauthorized disclosure of the [Responsive Records] reasonably could be expected to result in damage to national security," defined as "harm to the national defense or foreign relations of the United States . . . taking into

consideration such aspects of the information as the sensitivity, value, utility, and provenance of that information." Exec. Order No. 13,526 §§ 1.1(a)(4), 6.1(1).

The government's central argument on appeal, supported by the Horst Declaration, is that release of the mug-shots and videos of al-Qahtani could logically and plausibly serve as propaganda for extremists and incite anti-American violence, which, in turn, could reasonably be expected to result in damage to national security.[10]

In response, CCR argues that accepting the "propaganda" justification would "stymie FOIA's aim[s]" by permitting the government to "disregard the people's right to a transparent government whenever there is a distant risk that someone, somewhere could respond with violence." Appellant's Br. 34. CCR warns that this justification would, perversely, be most forceful where the information was most controversial and, accordingly, of greatest interest to the public. *Cf. Ray v. Turner*, 587 F.2d 1187, 1209 (D.C. Cir. 1978) (Wright, *J.*, concurring in the remand) (noting that Congress amended Exemption 1 to prevent the Executive from classifying information that "is embarrassing or incriminating"

---

[10] On appeal, the government also cites the following as threats to national security: (1) the compromise of relationships with cooperating detainees; (2) the possibility that disclosure could be perceived as inconsistent with the Geneva Convention; and (3) the possibility that release of the images could facilitate sending of coded messages by detainees. Because we resolve the case on the basis that the mug shots and videos of al-Qahtani could incite violence against American interests and be used by anti-American extremists as propaganda, we need not address these other purported threats.

(internal quotation marks omitted)). CCR asserts further that the over-breadth of the Horst Declaration exemplifies the danger of the so-called "slippery slope" of the government's argument. Specifically, instead of explaining how the particular records at issue here would provoke the United States' enemies, General Horst suggests that release of *any* depiction of *any* detainee would endanger national security and, accordingly, should be exempt from disclosure under FOIA. Appellant's Br. 33.

It is of course true that, if invoked reflexively by the government, and accepted unquestioningly by reviewing courts, the "propaganda" justification could shield a broad range of documents of significant public interest, in contravention of FOIA's central purpose. The possibility that a particular justification might be abused, however, does not render it meritless in all circumstances. As Justice Oliver Wendell Holmes recognized long ago, "most of the distinctions of the law are distinctions of degree" and courts, in any given situation, "can defeat an attempt to . . . go too far without wholly abolishing [the authority or right at issue]." *Panhandle Oil Co. v. Mississippi ex rel. Knox*, 277 U.S. 218, 223 (1928) (Holmes, J., dissenting).[11] Whether the government's justifications for withholding information in the name of national security go too far is a question that must be evaluated in the context of the particular circumstances presented by each case.

---

[11] As Justice Arthur J. Goldberg similarly remarked, "[i]t is of course true that great consequences can grow from small beginnings, but the measure of . . . adjudication is the ability and willingness to distinguish between real threat and mere shadow." *Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203, 308 (1963) (Goldberg, J., concurring).

We now turn to the circumstances at issue here. We note, as a preliminary matter, that we need not view the Horst Declaration in a vacuum, and may consider the record as a whole in determining whether the justifications set forth in the declaration are logical and plausible *in this case. Cf. Gardels v. CIA*, 689 F.2d 1100, 1105 (D.C. Cir. 1982) ("The test is not whether the court personally agrees in full with the [Agency]'s evaluation of the danger—rather, the issue is whether on the whole record the Agency's judgment objectively survives the test of reasonableness, good faith, specificity, and plausibility in this field of foreign intelligence in which the [Agency] is expert and given by Congress a special role.").

The record makes clear that al-Qahtani is not just any detainee: The government has publicly stated that al-Qahtani is "the intended 20th Hijacker in the 9/11 attack that killed more than 3,000 innocent people," and "an al Qa[e]da operative with strong ties to senior al Qa[e]da leadership, including Osama Bin Laden." News Release, Dep't of Defense, *Guantanamo Provides Valuable Intelligence Information* (June 12, 2005) (J.A. 309). Apart from his notable profile, al-Qahtani is unusual because a significant government official has publicly opined that the interrogation methods used on him met the legal definition of torture.[12]

---

[12] Relevant to our inquiry here is the public nature of these statements and the fact they were made by a high-ranking DoD officer. Whether the statements are true, and whether they are supported or refuted by the Responsive Records, is irrelevant for our purposes. We note, additionally, that our reliance on these statements does not support, as a general matter, government non-disclosure of documents which may reveal wrongdoing. First of all, the Government has already publicly disclosed the alleged

CCR asserts that the government's prior and extensive disclosures regarding al-Qahtani undermine its justifications for withholding the Responsive Records.[13] On the contrary, we conclude that, inasmuch as these disclosures have heightened al-Qahtani's prominence, here and abroad, they increase the likelihood that official release of images of al-Qahtani—even images that do not depict abuse or mistreatment—could be exploited by extremist groups as tools to recruit or to incite violence.[14]

We find, moreover, that *images* of al-Qahtani, alone and interacting with military personnel, particularly when released directly by the FBI and DoD, may prove more effective as propaganda than previously released written records that disclose the same—or even more controversial—information about al-

wrongdoing and cannot, here, be accused of withholding that information. Moreover, the parties (the government in its brief in support of summary judgment and CCR at oral argument) and the District Court agree that the images in question do not depict al-Qahtani being tortured. *See Ctr. for Constitutional Rights*, 968 F. Supp. 2d at 637 ("confirm[ing] [based on review of the FBI Index] the Government's public representation that these records do not document any abuse or mistreatment") (internal quotation marks omitted).

[13] As a general matter, it is well-established that "the government's decision to disclose some information [does not] prevent[] the government from withholding other information about the same subject." *Am. Civil Liberties Union v. U.S. Dep't of Def.*, 628 F.3d 612, 625 (D.C. Cir. 2011).

[14] *See* Note 16, *post*.

In combination with the government's public disclosures about al-Qahtani's treatment and the leaked interrogation logs, however, even innocuous photographs and videos could readily be used to inspire unrest similar to that caused by the dissemination of the (arguably more controversial) Abu Ghraib photos in 2004, or the alleged mishandling of Korans at Guantanamo in 2005, to which General Horst referred in his declaration.

Qahtani's detention.[15] *See Judicial Watch, Inc. v. U.S. Dep't of Def.*, 715 F.3d 937, 942 (D.C. Cir. 2013) (finding it plausible "that releasing [seemingly innocuous] images of American military personnel burying [Osama Bin Laden] could cause exceptionally grave harm" in the form of "violence and attacks against United States interests" (internal quotation marks omitted)).

As in every FOIA action, our holding is limited to the particular facts and circumstances of this case, as set forth above: We do not now hold that every image of a specifically identifiable detainee is exempt from disclosure pursuant to FOIA, nor do we hold that the government is entitled to withhold any documents that may reasonably incite anti-American sentiment.

In sum, we conclude that the record of this case establishes, at a minimum, a reasonable possibility that the government's release of these images of al-Qahtani, in the context of what is already publicly known about him, would be singularly susceptible to use by

---

[15] Other than four photographs of detainees—whose identities we do not know—which were apparently released pursuant to FOIA requests, the only images of specifically identifiable detainees cited by CCR as having been publicly released are photographs taken by the International Committee of the Red Cross ("ICRC") with the permission of the detainee pursuant to well-established procedures at Guantanamo. *See* Appellant's Br. 38, J.A. 661-62. According to the ICRC, it releases these photographs only to the detainee's family, at which point it cedes control over the dissemination of these photographs to the family. This type of dissemination is readily distinguishable from release *by the DoD and/or the FBI* directly into the public domain of photographs taken without the permission of the detainee. Moreover, CCR's assertion that it is implausible that "the propaganda value of a photograph or video is appreciably greater where the detainee is identifiable" is forcefully and persuasively refuted by the Horst Declaration and, in any event, defies common sense.

extremist groups to incite anti-American hostility. That, in turn, could reasonably be expected to damage the national security of the United States. Accordingly, the Responsive Records were properly classified under Executive Order 13,526, and are therefore exempt from disclosure pursuant to FOIA Exemption 1.[16]

## CONCLUSION

For the reasons set out above, we hold that government-released images and videos of one of Guantanamo Bay's most high-profile detainees, who is closely associated with al Qaeda and the 9/11 attacks, and whose interrogation was publicly deemed "torture" by a government official, could logically and plausibly be used by anti-American extremists as propaganda to recruit members and incite violence against American interests at home and abroad, causing damage to the national security. Such threats to national security justify non-disclosure of the Responsive Records pursuant to FOIA Exemption 1.

Accordingly, we **AFFIRM** the September 12, 2013 judgment of the District Court.

---

[16] Additional justifications for withholding the Debriefing videos are set forth in the classified declaration of Mark H. Herrington. We have reviewed this declaration *in camera* and, although it is not necessary to the resolution of this appeal, we note that the classified declaration provides *additional* valid justifications for withholding the Debriefing videos.